**UNITED STATES of America**

v.

**Reginald D. McGLORY, Melvin Hauser, Norman Gomez, a/k/a Chubbs, Roland Slade, Norma Jean Pruitt, Vira Kulkivit, a/k/a Wee, Yongyos Thauthong, Willie J. Purdom and Charles Cotton.**

**Vira Kulkovit, Appellant.**

**UNITED STATES of America**

v.

**Reginald D. McGLORY, Melvin Hauser, Norman Gomez, a/k/a Chubbs, Roland Slade, Norma Jean Pruitt, Vira Kulkivit, a/k/a Wee, Yongyos Thauthong, Willie J. Purdom and Charles Cotton.**

**Melvin Hauser, Appellant.**

**UNITED STATES of America**

v.

**Reginald D. McGLORY, Melvin Hauser, Norman Gomez, a/k/a Chubbs, Roland Slade, Norma Jean Pruitt, Vira Kulkivit, a/k/a Wee, Yongyos Thauthong, Willie J. Purdom and Charles Cotton.**

**Reginald D. McGlory, Appellant.**

**UNITED STATES of America**

v.

**Reginald D. McGLORY, Melvin Hauser, Norman Gomez, a/k/a Chubbs, Roland Slade, Norma Jean Pruitt, Vira Kulkivit, a/k/a Wee, Yongyos Thauthong, Willie J. Purdom and Charles Cotton.**

**Charles Cotton, Appellant.**

**Nos. 90–3604, 90–3755, 91–3088 and 91–3194.**

United States Court of Appeals, Third Circuit.

Argued Sept. 30, 1991.

Decided June 19, 1992.

Louise Porac (Argued), Homestead, Pa., for appellant Vira Kulkovit.

Ellen M. Viakley, and John L. Doherty (Argued), Manifesto Doherty & Donahoe,

**314**

P.C., Pittsburgh, Pa., for appellant Melvin Hauser.

Thomas R. Ceraso (Argued), Ceraso & Tarosky, Greensburg, Pa., for appellant Reginald D. McGlory.

Larry P. Gaitens (Argued), Gaitens, Tucceri & Nicholas, P.C., Pittsburgh, Pa., for appellant Charles Cotton.

Thomas W. Corbett, Jr., U.S. Atty., Constance M. Bowden (Argued), Asst. U.S.

Atty., Paul J. Brysh, Office of U.S. Atty., Pittsburgh, Pa., for appellee.

BECKER, HUTCHINSON and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

## TABLE OF CONTENTS

| | Page |
|---------------------------------------------------------------------------------------------|------|
| I. THE PARTIES AND THE CHARGES | 314 |
| II. THE ISSUES ON APPEAL | 315 |
| III. JURISDICTION | 315 |
| IV. FACTS | 315 |
| V. DISCUSSION | 321 |
| A. The Sufficiency of the Evidence | 321 |
| 1. The Evidence Against Hauser | 322 |
| 2. The Evidence Against Cotton | 326 |
| 3. The Evidence Against Kulkovit | 327 |
| B. Challenges to the Admission of Notes Seized From McGlory's Residences and his Trash | 328 |
| 1. Authenticity | 328 |
| 2. Hearsay | 331 |
| 3. Coconspirator Exception to the Hearsay Rule | 333 |
| C. Cotton's Challenge to the Admission of Butler's Testimony | 338 |
| D. Motions to Sever | 339 |
| E. Cotton's Motion to Suppress the Evidence Seized From his Vehicle | 341 |
| F. Hauser's and Kulkovit's Motions for a Mistrial | 343 |
| G. Kulkovit's Challenge to the Government's Affidavit in Support of Orders Authorizing Electronic Surveillance | 345 |
| H. Kulkovit's Challenge to the Admission of Expert Testimony | 345 |
| I. Sentencing Challenges by McGlory and Kulkovit | 346 |
| 1. Challenge to the Guidelines Calculation | 347 |
| 2. McGlory's Challenge to the Status of His Two Prior Felony Convictions | 348 |
| VI. CONCLUSION | 351 |

## I.

### THE PARTIES AND THE CHARGES

In these four consolidated appeals, Reginald McGlory (McGlory), Melvin Hauser (Hauser), Charles Cotton (Cotton) and Vira Kulkovit (Kulkovit) seek to overturn their drug offense convictions on various grounds. Following a jury trial in the United States District Court for the Western District of Pennsylvania, McGlory, Hauser, Cotton and Kulkovit were convicted of conspiring to possess with intent to distribute and to distribute heroin in violation of 21 U.S.C.A. § 846 (West Supp.1991)

(Count One). McGlory, Hauser and Cotton were each convicted of possession of heroin with intent to distribute in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(C) (West 1981 & Supp.1991) (Counts Three, Four, Nine and Ten). Cotton was also convicted of possessing a mixture of heroin and cocaine with intent to distribute (Count Two). McGlory was convicted of being a felon in possession of a firearm in violation of 18 U.S.C.A. § 922(g)(1) (West Supp.1991) (Count Thirteen) and of using a firearm during drug trafficking in violation of 18 U.S.C.A. § 924(c)(1) (West Supp.1991)

(Count Fourteen). McGlory and Kulkovit were also each convicted of laundering drug proceeds in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) (West Supp.1991) and 18 U.S.C.A. § 2 (West 1969) (Counts Fifteen through Twenty–Four).

The district court sentenced Kulkovit to a term of imprisonment of 360 months at Count One (conspiracy) and 240 months at Counts Fifteen through Twenty–Four (money laundering) to be served concurrently with each other and with the sentence imposed at Count One. Hauser received concurrent sentences of 300 months at Count One (conspiracy) and 240 months at both Counts Nine and Ten (possession). Cotton received concurrent sentences of 240 months on each count against him. McGlory was sentenced to life imprisonment at Count One (conspiracy) under 21 U.S.C.A. § 841(b)(1)(A)(i) (West Supp.1991) because he had two prior convictions for a felony drug offense. At Count Fourteen (felon in possession of firearms), he received sixty months to be served consecutively with his sentence at Count One. At Counts Four (possession of heroin), Thirteen (use of firearm during drug trafficking) and Fifteen to Twenty–Four (money laundering), he received sentences concurrent with the one at Count One. We will affirm.

## II.

### THE ISSUES ON APPEAL

Hauser, Cotton and Kulkovit claim that there is insufficient evidence to sustain their conspiracy convictions. All four contest the admissibility of undated notes and scraps of paper seized from McGlory's trash and his residences. McGlory, Cotton and Kulkovit argue the district court abused its discretion in denying them relief from prejudicial joinder. Hauser and Kulkovit argue the district court should have granted a mistrial when a government witness invoked the fifth amendment thereby precluding cross-examination. Kulkovit and McGlory argue the district court erred in considering statements at sentencing of the same government witness who was not subject to cross-examination at trial.

Independent of each other, Cotton, Kulkovit and McGlory make additional arguments. Cotton argues that evidence implicating him in crimes not charged should not have been admitted and that evidence improperly seized from his vehicle should have been suppressed. Kulkovit argues there was not substantial evidence sufficient to support his conviction for money laundering and that the affidavit the government filed in support of orders authorizing electronic surveillance did not sufficiently allege the need for electronic surveillance. He also says that the district court abused its discretion both in admitting the testimony of a Drug Enforcement Administration (DEA) agent concerning heroin coming from Thailand and the opinions of a handwriting expert about his signature on wire transfer forms. Finally, McGlory argues that his life sentence was not mandated because he only had one, rather than two, predicate prior felonies.

## III.

### JURISDICTION

The district court had subject matter jurisdiction under 18 U.S.C.A. § 3231 (West 1985). We have jurisdiction over the district court's final orders of conviction and sentence under 28 U.S.C.A. § 1291 (West Supp.1991). Because appellants raise a multitude of issues, we will set out the standard for review of each issue at or near the beginning of our analysis relating to each issue.

## IV.

### FACTS

The issues concerning sufficiency of the evidence the various appellants raise are close and difficult. Therefore, we will review the evidence in detail. After two years of investigation by agents of the DEA and the Pittsburgh Police, including personal observation in Pittsburgh, Los Angeles and Thailand, as well as electronic surveillance and searches of McGlory's garbage in Pittsburgh, the government concluded it had pieced together a major her-

oin conspiracy involving defendants McGlory, Kulkovit, Cotton, Hauser, Norman Gomez (Gomez)[1] and others.

The government's evidence showed the following chronology of events. On July 14, 1986 and August 28, 1986, McGlory, using the name Timothy Reed, sent $2,000.00 via Western Union from the CheckMart in Pittsburgh to Vira Kulkovit in Los Angeles. On June 16, 1987, McGlory again purchased a money order for $2,000.00 in the name of Timothy Reed and sent it to Kulkovit. Upon his arrest, McGlory acknowledged that he had been using Timothy Reed as an alias. A driver's license with the alias Timothy Reed had McGlory's picture on it. A copy of a birth certificate for Timothy Reed and a letter setting out a social security number in the name of Timothy Reed were recovered from McGlory's trash in May 1989.

McGlory, again using the name Reed, made frequent trips to Los Angeles in 1987.[2] Hotel telephone records reveal that while there he made calls to numbers listed in his personal phone book for Kulkovit.

During the summer of 1987, Rolland Slade (Slade) began purchasing heroin from McGlory for redistribution. Slade testified concerning several purchases from McGlory. Also in the summer of 1987, Charles Butler (Butler) sold a kilogram of cocaine to Cotton. In succeeding months until Butler's arrest in September 1988, Cotton bought approximately five to ten ounces of cocaine a week from Butler. Cotton told Butler that he combined the cocaine with heroin and sold it under a tradename he had coined, "Double Dutch." On December 1, 1987, Detective Mary Causey observed Cotton sell a mixture of heroin and cocaine to an individual she set up to make the purchase.

On February 16, 1988, McGlory, still using the name Reed, sent a $2,500.00 money order to Kulkovit in Los Angeles. On March 8, 1988, McGlory was in Los Angeles and again made calls to a number associated with Kulkovit. On March 21, 1988, government informant Vernon Williams (Williams) made a controlled buy of a gram of heroin from Slade. Slade testified that McGlory, his source, provided the heroin he sold to Williams. Slade was arrested after this transaction and McGlory paid his bail. Slade also testified that on one occasion he saw several bags of heroin in McGlory's car and, on another occasion, a shoulder bag. McGlory told him the shoulder bag held $100,000.00. McGlory's telephone books also listed Slade.

On April 19, 1988, McGlory, again using the name Timothy Reed, sent yet another $2,500.00 money order to Kulkovit. On May 5, 1988, Kulkovit entered Thailand and departed that country on May 19, 1988. Between May 12 and May 15 of 1988, an individual named Prasert Poavalee (Poavalee) stayed at a hotel in Pittsburgh and made calls to McGlory and K & K Exotic Imports in Los Angeles, an operation associated with Kulkovit.

Sometime in July, 1988 the Pittsburgh Police began working with the DEA to collect garbage from two of McGlory's known residences at 4267 Bryn Mawr Road and 236 South Negley Avenue in Pittsburgh.[3] They would sort through the trash bags at a nearby dump, identify the bags that contained McGlory's garbage and keep anything that pertained to him. On July 8, 1988, officers recovered a piece of paper from McGlory's trash with names and numbers, including BroMel and "1/4" and "1/2," on it. *See* Exhibit 106. One of McGlory's phone books contained the name

---

1. Norman Gomez, a co-defendant, was tried jointly with McGlory, Hauser, Cotton and Kulkovit. App. at 16.

2. In contrast, when McGlory took pleasure trips to Aruba and Atlantic City, he used his real name.

3. The residence at 4267 Bryn Mawr Road was a single family dwelling connected to 4265 Bryn Mawr Road. The residence at 236 South Negley

Avenue was an apartment building with six or seven apartments. The evidence showed that McGlory lived with his mother and daughter at 4267 Bryn Mawr Road and with his girlfriend Dineen Hefflin at 236 South Negley Avenue. Agents observed him living at both places and saw that he had a key to his girlfriend's residence. Guns and other items belonging to McGlory were found during searches of both residences.

"BroMelvin" with Hauser's number next to it. On August 9, 1988, the police recovered several more pieces of paper from McGlory's trash. *See* Exhibits 105, 105A and 105B. One contained a list of seven names, including BroMel and Charley C, with numbers next to them. *See* Exhibit 105. The government argued to the jury that Charley C stands for Charles Cotton.

On August 25, 1988, and September 13, 1988, an individual named Larry Brown sent two money orders for $2,000.00 and $2,500.00 to Kulkovit in Los Angeles. On the money orders McGlory's Bryn Mawr Road address and phone number were listed beneath Brown's name. A Western Union employee testified that McGlory had used the name Brown to buy money orders.

On September 15, 1988, Detectives Pires and Smith observed a drug deal go down between Cotton and Gregory Tempolski in Cotton's vehicle. A search of Cotton's vehicle resulted in the seizure of approximately sixteen grams of heroin and $7,200.00 in cash.

On September 26, 1988, McGlory traveled to Los Angeles, again under the alias Timothy Reed, and stayed at the Stouffer's Concourse Hotel. On October 11, 1988, Pittsburgh Police recovered notes from McGlory's trash with initials and numbers in columns such as BM "5–45–15" and CC "5–50–20" and BroMel 16–146. *See* Exhibits 103, 103A, 103B, 104, 104A and 104B. Three of the notes were written on Stouffer's notepaper. Agent Rotter, the DEA agent in charge of the investigation, testified that, based on his experience in drug investigations, these notes were "owe sheets" which indicated McGlory's profit on the sale of approximately thirty-two ounces of heroin. On October 17, 1988, Kulkovit traveled to Pittsburgh and placed calls from his hotel to McGlory's residences.

On October 28, 1988, McGlory, under his alias Timothy Reed, sent a $1,000.00 money order to Kulkovit. On November 8, 1988, Kulkovit traveled to Pittsburgh and made calls from his room to numbers associated with Hauser and McGlory, and to Bangkok, Thailand. An individual named Sutichai Kulkovit travelled to Pittsburgh on November 25, 1988 and made calls to McGlory and a number in Bangkok.[4] On November 15, 1988 a piece of paper was recovered from McGlory's trash with the name "We" and a Bangkok telephone number on it. *See* Exhibit 136. Other evidence showed that Kulkovit used the name "We."

On December 13 and 18, 1988, the Pittsburgh Police again recovered papers from McGlory's trash with names and numbers written on them, such as Mel 10–50. *See* Exhibits 107 and 108. There was evidence that the numbers indicated the cost of heroin supplied to the named person. On January 17, 1989, $8,800.00 was recovered from McGlory's trash at 4267 Bryn Mawr Road in a brown paper bag. Although it was not written up in their report, Agents Rotter and Craig testified they recalled that an envelope addressed to McGlory was found in the same trash bag.

On December 27, 1988, Kulkovit again entered Thailand. He left that country on January 23, 1989. On January 1, 1989, two calls were placed from McGlory's residence to a Bangkok, Thailand number associated with Kulkovit. A piece of paper with the name "We" and this same number written on it was recovered from McGlory's trash on January 31, 1989. *See* Exhibit 137.[5] Kulkovit was registered at a hotel in Pittsburgh from January 26–27, 1989. McGlory's girlfriend Hefflin was registered at

---

**4.** Sutichai Kulkovit was not a defendant in this case and at trial he was never precisely identified. When registering at hotels in Pittsburgh, however, he listed the same address as that used by Vira Kulkovit and Yongyos Thauthong (Thauthong), an alleged associate of Kulkovit. This address was for K & K Exotic Imports, 7928 Melrose Avenue, Los Angeles. The evidence showed that bills to K & K Exotic for phones and electronic pagers were in the name of Sutichai Kulkovit and that K & K Exotic could have been used as a front for illegal drug transactions. Pittsburgh hotel records in S. Kulkovit's name showed calls to McGlory and to various Bangkok telephone numbers Vira Kulkovit and McGlory also called.

**5.** This same Bangkok number was also listed on Pittsburgh hotel telephone records in the names of Vira and Sutichai Kulkovit.

the same hotel as Kulkovit during this time. Surveillance agents observed McGlory's car parked next to the hotel. On February 9, 1989, McGlory, still using the name Timothy Reed, sent $2,000.00 to Kulkovit in Los Angeles. On February 21, 1989, Pittsburgh Police recovered a piece of paper from McGlory's trash which stated "Tell We [Kulkovit] I never called because the newspaper never came in." *See* Exhibit 102.

On February 28, 1989, a bag containing a wrapper with heroin residue was recovered from the trash in front of 4265 and 4267 Bryn Mawr Road. Dr. Charles Winek, the government's expert, testified that the package would hold approximately thirty-two ounces of heroin. Agent Rotter testified that the trash bag containing the package with heroin residue also held dog waste wrapped in newspapers. He testified that McGlory had several dogs at the time, but his neighbor at 4265 Bryn Mawr Road had none. A different bag of garbage removed from in front of 4265 and 4267 Bryn Mawr Road that same day contained materials identifying it as coming from McGlory's neighbor's house at 4265 Bryn Mawr Road.

On March 11, 1989, McGlory wired $1,000.00 to Poavalee. On April 12, 1989, McGlory, as Timothy Reed, wired Kulkovit $3,000.00 via Western Union. The receipt for this transaction was found in McGlory's garbage on May 1, 1989. Also found in his trash on that day were three pieces of paper. One had various calculations and the figure $1,404,000.00 written on it. *See* Exhibit 110. Another piece of paper had written on it "7 salesman, 32 plots at 10K per plot." *See* Exhibit 100. Two of the seven initials on the paper were BM and CC. App. at 964. Charles Cotton's initials are CC. Hauser was listed in one of McGlory's telephone books as BroMelvin. Agent Rotter testified that the notes indicated that McGlory was buying heroin in thirty-two ounce quantities for $6,000.00 an ounce and selling it for $10,000.00. The

third piece of paper was a torn deposit slip from McGlory's bank account with initials and numbers in columns written on it similarly to the other notes found in the trash. *See* Exhibit 101.

On April 22–24, 1989, Thautong, an alleged associate of Kulkovit's,[6] was registered at the Holiday Inn Greentree in Pittsburgh and made phone calls to McGlory's residences. An envelope with the name and number of the Holiday Inn written on it was recovered from McGlory's trash on April 24, 1989. On May 5–8, 1989, Thauthong was again registered at a hotel in Pittsburgh. He made phone calls to McGlory, Los Angeles and Bangkok. Surveillance agents observed Thautong meet with McGlory on May 8, 1989. When he entered McGlory's residence he was carrying a shoulder bag that appeared to be empty. When he exited it appeared heavier.[7] On May 21–22, 1989, S. Kulkovit was registered at a hotel in Pittsburgh under the name of K & K Exotic Imports. On June 9, 1989, McGlory, yet again using the name Timothy Reed, wired $2,000.00 to Kulkovit in Los Angeles.

In Spring of 1989, Robert Harris began buying cocaine and heroin from Cotton. Harris testified that Cotton told him to package the cocaine and heroin in one balloon and sell it as "Double Dutch." Appendix of Appellant McGlory (App.) at 675, 683. Harris received heroin and cocaine from Cotton on a weekly basis until Harris' arrest in September 1989. Williams testified that he tried to purchase heroin from Cotton for $2,700.00 in the summer of 1989. Cotton told Williams that he did not sell anything under $3,000.00 and if Williams wanted an eighth of an ounce he should see McGlory. Sometime in May 1989, Williams discussed purchasing heroin with co-defendant Gomez and Gomez told him that the heroin came from out west. Williams bought heroin from Gomez twice in August of 1989.

---

**6.** A Western Union name change form revealed that a money order dated February 20, 1989 from Tim Reed to Kulkovit was picked up by Thautong.

**7.** The jury viewed the surveillance tape of this meeting.

In June 1989, the government obtained a warrant authorizing wire receptions at McGlory's residences at 4267 Bryn Mawr Road and 236 South Negley Avenue. The government recorded telephone calls to and from these residences from June 15, 1989 to August 11, 1989. On June 17, 1989, Kulkovit called a number associated with McGlory but could not reach him. On July 1, 1989, McGlory, using the name Timothy Reed, wired $2,000.00 to Kulkovit.

On July 1, 1989, at approximately 7:00 p.m., Hauser called McGlory and McGlory said "I'm getting ready to go out, Man, I'll bring it by." Government Appendix (Govt.App.) at 7. Surveillance agents then saw McGlory exit his residence carrying "what appeared to be" two white plastic trash bags, App. at 987, with something rectangular in shape in them. He dropped one of the bags off at Hauser's residence. Hauser left a message at McGlory's residence at approximately 10:00 p.m. that evening that "I'm gonna bring those slippers back down to you." Govt.App. at 8.

On July 2, 1989, Hauser told informant Williams he could supply him with heroin but his source was "at a cookout that night." App. at 265. On the morning of July 3, 1989, Hauser called McGlory and asked him if he sent his "slippers" back to the store yet and that he was going to come over and look at them. Govt.App. at 13. Special Agent Iorio observed Hauser meet with McGlory at McGlory's house. Hauser was carrying a box about six inches by six inches wrapped in brown paper. When he left, he was not carrying the box and was placing something white in his waistband. After Hauser returned home, McGlory called Hauser and asked if "that was 44" and Hauser agreed that it was. Id. at 14. Later that evening Williams purchased an eighth ounce of heroin from Hauser for $2,000.00. Williams purchased another eighth ounce of heroin from Hauser three weeks later.

On July 8, 1989 at 2:00 p.m. McGlory asked Cotton in a recorded conversation if he was ready to meet him at the Crossroads Bar in fifteen minutes. McGlory asked Cotton if he still had some "pizzas" or "pieces" and Cotton replied he was trying to get some now. Id. at 19. Following that conversation Agent Rotter observed McGlory and Cotton meet in the area of the Crossroads Bar. McGlory had left his residence carrying a small gym bag. McGlory got into Cotton's vehicle carrying a small black paper bag, sat there momentarily and exited the vehicle without the bag.

On July 8, 1989, Vira Kulkovit, travelling under the name of W. Bamroonk, arrived in Pittsburgh. He called McGlory and told him his hotel room number. From July 8 to July 9, 1989, Kulkovit made repeated attempts to reach McGlory saying he needed money and had to "go back" tomorrow or he would be in "big trouble." Id. at 20–32. In the afternoon of July 9, 1989, surveillance agents observed McGlory meet with Kulkovit. Kulkovit exited McGlory's vehicle carrying a plastic bag. DEA Agent Michael Moore testified that the bag had "jagged edges" and looked like it was filled with stacks of paper. App. at 1130–31. Agent Rotter testified that the bag appeared full. Kulkovit boarded a plane for Los Angeles that day. Later that evening, McGlory told an unidentified caller that he hadn't gone out all day because his "moy" or man was there from California. Govt. App. at 35.

On July 17, 1989, McGlory left a message for Kulkovit at the Thai Town Restaurant in Los Angeles that he would "see him tomorrow." Id. at 43. On July 18, 1989, McGlory called his mother to say that he was going out to California to pick up his money. Id. at 45. That same day he called Kulkovit at the Thai Town Restaurant and said "How about if, a, you take 8 out of that right, and I take care of the guy, that, tell him to bring it, Man, and give him a 'G' and, whatever it takes." Id. at 48. On July 19, 1989, McGlory called Hauser and told him the figure was "19–29–75. Uh, 627, 75, 1000 and 302." Id. at 50. On July 24, 1989, McGlory called his mother and asked if We called because We owed him "big money." Id. at 53. On July 25, 1989, McGlory called his mother who told him that a Mrs. Walker had been subpoenaed by the Internal Revenue Service (IRS). On this date, the IRS had sent subpoenas to

certain individuals seeking information about McGlory's financial transactions.

On July 26, 1989, McGlory called his mother and again indicated that Kulkovit had his money, "my 75," and he was going to have to go out there. *Id.* at 58. McGlory spoke with Cotton later that day:

[McGlory]: Hey, look. We remodeling the restaurant, right?

[Cotton]: Uh huh.

[McGlory]: Uh, an we might have, uh, one last, uh, she-bang Man. We have a party there for the summer. We may have to . . . it might take a while to get it back together.

[Cotton]: Uh huh.

[McGlory]: I wanted to inform you cause, uh, I know you wanted to make sure your party got to eat.

[Cotton]: Right.

[McGlory]: So, its not good. I got the information for you and whenever you can get out, I can talk to you.

*Id.* at 57–62. On August 2, 1989, McGlory told an unidentified caller that he had problems and "I may never buy no more, man." The caller responded "But you already got your load" and McGlory reiterated that he had problems. *Id.* at 63. In August of 1989, Cotton told Harris he would have to cut back on the amount of heroin he had been supplying Harris because Cotton's supplier was under investigation by the FBI and had cut back on his supply to Cotton.

On August 6, 1989 Hauser called McGlory about meeting and suggested that it might be better to wait until it got dark. Later that evening surveillance agents observed Hauser pick up McGlory and drive a short distance. McGlory was in Hauser's vehicle for only five minutes and then got out and proceeded on foot. On August 8, 1989, Kulkovit called McGlory and McGlory told him not to say too much on the phone and "that was another phone I called you from." McGlory told Kulkovit he couldn't work anymore. They talked about a person "carrying" for McGlory and an "order"

that McGlory didn't need anymore because he was under investigation by the FBI. McGlory then said the following:

"Put the shit down in the ice box or something. It ain't gonna spoil. . . . It don't need the paper that bad, Man. They lock your ass up, Man, you don't believe that. . . . I'm telling you they know your name. I'm saying you, you file your stuff under, under this gambling act, Man, you just going to have to put aside, tell them that you gave me twenty-five grand to invest for you and I paid it back, Man, and that's why I sent the money out there. Two thousand at a time. You don't have that correlating, Man. They might arrest you while you sitting down there eating."

*Id.* at 69. Finally, McGlory said he'd call Kulkovit tomorrow from another phone. *Id.*

On September 8, 1989, the Pittsburgh police and DEA agents seized narcotics paraphernalia containing heroin residue from McGlory's residence at 4267 Bryn Mawr Road. They also searched the basement which was common to the residences at 4265 and 4267 Bryn Mawr Road. In the basement, they found a metal bowl, spoons, a triple beam scale, playing cards, a sifter and a grinder in a large bag.[8] The bag also contained McGlory's business card for KYE Enterprises and a business card with initials and numbers written on it similar to those on the notes found in McGlory's trash. *See* Exhibits 56 and 57A. The agents also found cash in the amount of $184,515.00 in an attache case which was locked in a room in the basement and a shaving kit containing $4,000.00 at 236 South Negley Avenue. A United States currency validator, a money counting machine, a binder containing an article entitled "Money Laundering. How Crooks Recycle $80 Billion a Year in Dirty Money" and several weapons were also seized from both residences. Finally, the agents also recovered address books containing phone numbers for Cotton, Hauser and Kulkovit,

---

**8.** DEA Agent Edward Scheid testified that playing cards are often used to mix heroin, sifters and grinders are used to refine heroin from a rock-like to a powder substance and triple beam scales are commonly used when packaging drugs for distribution.

and several more notes with initials, computations and phone numbers written on them similar to those recovered from earlier searches of McGlory's trash. *See* Exhibits 112, 113, 114, 115 and 138.

When McGlory was arrested, Agent Rotter wrote down McGlory's statements in a report. Agent Rotter told McGlory that McGlory was said to be the number one heroin man in Pittsburgh and McGlory replied "that's what they say.... the ones that know." App. at 1743. McGlory also discussed his "friend" in Los Angeles, and advised that he had gone to Los Angeles once or twice a month. *Id.* at 1744, 2169. He indicated that his "friend" was like family to him and he would have to think about cooperating against him. *Id.* at 227.

From the evidence admitted at trial, the jury found that McGlory operated a large heroin distribution business in the Pittsburgh area from about July 1986 to September 1989. The heroin was imported from Thailand to Los Angeles and then brought to Pittsburgh for distribution. Kulkovit was McGlory's supplier. Defendants Cotton, Hauser and others helped McGlory distribute it. Whether the jury was justified in these findings is the issue before us.

## V.

## DISCUSSION

Because we review the entire record in addressing a claim of insufficient evidence, regardless of challenges to the admission of some evidence, we consider appellants' sufficiency argument first. We must reverse a conviction when the evidence is insufficient to support the verdict. *United States v. Inigo,* 925 F.2d 641, 649 (3d Cir. 1991). If we decide the evidence is sufficient, only then do we need to decide whether any of the appellants' challenges entitle them to a new trial, resentencing or other relief. *Cf. Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (when reviewing court reverses conviction for insufficiency of evidence, Double Jeopardy clause bars retrial).

### A. *The Sufficiency of the Evidence*

Hauser, Cotton and Kulkovit, but not McGlory, seek reversal of their conspiracy convictions on the ground that the evidence against them is insufficient to prove their participation in the charged conspiracy. We note at the outset that a "claim of insufficiency of the evidence places a heavy burden on an appellant." *United States v. Gonzalez,* 918 F.2d 1129, 1132 (3d Cir.1990) (quotation omitted), *cert. denied,* — U.S. ——, 111 S.Ct. 1015, 112 L.Ed.2d 1097 (1991). Moreover:

> It is not for [an appellate court] to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.

*United States v. Glasser,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *see United States v. Cooper,* 567 F.2d 252, 254 (3d Cir.1977) ("The evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt.") (quoting *United States v. Allard,* 240 F.2d 840, 841 (3d Cir.1957)).

The government must, however, prove each element of conspiracy beyond a reasonable doubt. Thus, it must establish "a 'unity of purpose,' intent to achieve a common goal, and an agreement to work together toward that goal." *United States v. Wexler,* 838 F.2d 88, 90–91 (3d Cir.1988); *see United States v. American Investors of Pittsburgh, Inc.,* 879 F.2d 1087, 1100 (3d Cir.), *cert. denied,* 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989). The government may, nevertheless, prove these elements entirely by circumstantial evidence. *United States v. Kapp,* 781 F.2d 1008, 1010 (3d Cir.), *cert. denied,* 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986). In *Kapp,* we said:

> [T]he existence of a conspiracy can be inferred "from evidence of related facts and circumstances from which it appears as a reasonable inference, that the activities of the participants ... could not have been carried on except as the result

of a preconceived scheme or common understanding."

*Id.* at 1010 (quoting *United States v. Ellis*, 595 F.2d 154, 160 (3d Cir.), *cert. denied*, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979)). If *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction must be upheld. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). We examine the record with these general principles in mind.

### 1. The Evidence Against Hauser

■ A conspiracy is by its very nature clandestine. Thus circumstantial evidence is sometimes the sole support for a conviction. *United States v. Martinez*, 937 F.2d 299, 304 (7th Cir.1991). Hauser and McGlory were very careful. They spoke on the telephone only briefly and used guarded language. The record shows McGlory often used a cellular phone or made calls from other phones the government could not tap.

The government contends there was more than sufficient evidence from which a jury could infer that Hauser was obtaining heroin from McGlory and distributing it on a continuous basis. The government says that given the regularity and continuity of the relationship between McGlory and Hauser, and their use of guarded and coded language such as "slippers," the jury could infer Hauser's participation in the conspiracy. Hauser contends that out of the "mountain" of reports, surveillance, recordings, transcripts and fingerprints accumulated in over two years of investigating McGlory, the evidence of his involvement with McGlory was minimal. Hauser contends that the only evidence connecting him with McGlory is that they talked on the phone about shoes, Hauser went to McGlory's house carrying a rectangular box, Hauser's phone number was in McGlory's address book and "Bro Mel" was written by an unknown author on undated scraps of paper which, in Agent Rotter's opinion, were drug records.

The following evidence implicates Hauser in the conspiracy the government

charged. On November 8, 1988, Kulkovit was registered at a hotel in Pittsburgh and made two calls to a number listed to Hauser. On July 1, 1989, at approximately 7:00 p.m., Hauser called McGlory and McGlory said "I'm getting ready to go out, Man, I'll bring it by." Govt.App. at 7. Surveillance agents then saw McGlory exit his residence carrying what appeared to be two white plastic trash bags with something rectangular in shape in them. He dropped one of the packages off at Hauser's residence. Hauser left a message at McGlory's residence at approximately 10:00 that evening that "I'm gonna bring those slippers back down to you." *Id.* at 8.

Williams testified that in the afternoon of July 2, 1989, he arranged to purchase heroin from Hauser. Hauser told Williams to see him later because his source was "at a cookout" that evening. App. at 263–65. On the morning of July 3, 1989 Hauser called McGlory and the conversation was as follows:

> [Hauser]: Did you send it back to the store yet?
>
> [McGlory]: My shoes?
>
> [Hauser]: Yeah. Them slippers.
>
> [McGlory]: Yeah.
>
> [Hauser]: Did you send them back to the store yet?
>
> [McGlory]: Oh, no, Man, no.
>
> [Hauser]: Still got them?
>
> [McGlory]: Uhm uh.
>
> [Hauser]: I'm gonna come over and have a look at 'em....

Govt.App. at 13. At approximately 8:00 a.m., surveillance agents observed Hauser arrive at McGlory's residence carrying a rectangular box wrapped in brown paper. Agent Iorio testified that McGlory came to the door, Hauser stepped inside and that Hauser and McGlory met for about five to ten minutes outside of his view. Hauser left the house without the box, stuffing something white into the waistband or pocket of his jogging suit.

Hauser returned to his residence at 8:20 a.m. and at 8:36 a.m., he received the following call from McGlory:

[McGlory]: Hey, Boss, you, that was 44, right?

[Hauser]: Was it 44?

[McGlory]: Forty–Four.

[Hauser]: Alright.

*Id.* at 14. Officer Hediger testified that he and Agent Rotter sent Williams to buy heroin from Hauser later that day. Hauser sold an eighth ounce of heroin to Williams that evening.

On July 18, 1989, McGlory called his mother and told her he was going to California. On July 19, 1989, McGlory called Hauser and told him the figure was "19–29–75" and then said the numbers "627, 75, 1000 and 302." *Id.* at 50. On July 28, 1989, Williams purchased another eighth ounce of heroin from Hauser.

About July 25, 1989, McGlory became aware that he was under investigation. On August 6, 1989, Hauser telephoned McGlory around 6:00 p.m. and Hauser suggested "Hey, man, wouldn't it be a little better as soon as it gets dark, man? How about that?" *Id.* at 64. At 9:15 p.m., surveillance agents observed Hauser pick up McGlory. About five minutes later, McGlory got out of the car and proceeded on foot.

Notes and scraps of paper seized during searches of McGlory's known residences and from the trash outside in 1988 and 1989 indicate that McGlory was keeping track of transactions involving large sums of money with an individual named "Bro-Mel" on a regular basis. Agent Rotter testified that in his opinion these notes were records of drug transactions. Government informants Slade and Williams testified that they would use the nicknames "Brother Melvin" "Brother Mel" or "Abdul" in speaking with Hauser. App. at 283, 474. McGlory's personal phone book contained an entry for "BroMelvin" and a number listed to Hauser.

Four of the seized notes characterized as owe sheets used in the drug trade contain the name "BroMel" in a column of names matched with numbers. *See* Exhibits 104, 105, 106 and 112. One contains the name BroM and another the initials BRM. *See* Exhibits 109 and 114. Four similar notes contain the initials BM. *See* Exhibits 100, 103A, 103B and 108. One contains the name Mel. *See* Exhibit 107. Finally, three notes contain just the initial B or M. *See* Exhibits 101, 104B and 113. The government's handwriting expert found "numerous similarities" to McGlory's handwriting exemplars on four of the notes the government offered as evidence of Hauser's participation in the conspiracy.

The sufficiency question may be close but, from this evidence and all the facts and circumstances of the case, we think Hauser's knowing participation in the conspiracy to distribute heroin can be inferred. Although Agent Rotter admitted that he and the other agents never broke any "code" between Hauser and McGlory, App. at 187, a reasonable jury could infer that "slippers" was a code word. Although Hauser tells McGlory he is going to come over and look at McGlory's slippers, he brings to McGlory's residence a box wrapped in brown paper, leaves without the box and is seen stuffing something white, possibly a bag, into his pocket. McGlory then calls Hauser and says "that was 44, right?"

Hauser argues that he and McGlory were discussing shoes. The jury did hear evidence that McGlory, on the same day, placed a call to a shoe dealer he frequented in Los Angeles. Even though there was testimony from Agent Hediger and invoices showing that McGlory had bought shoes from Maurice Tawil of C & E Fashions in Los Angeles, we think that, based on the evidence, the jury could have believed "slippers" meant heroin.

In *United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir.1989), defendant Barrera worked in an electronics store. He challenged the sufficiency of the evidence of his participation in a drug conspiracy arguing that his recorded conversations with an alleged coconspirator Theodoropoulos related to transactions for television sets and not for cocaine. In the first recorded conversation Theodoropoulos expressed to Barrera his desire to buy a television. In a conversation three days later, Barrera offered to sell a television that was "a little bit over fifteen." *Id.*

(quotation omitted). In a conversation five days later, Theodoropoulos relayed his client's displeasure with the quality of the television's picture, and Barrera said he had better quality televisions available. *Id.* at 593–94. Barrera's employer testified that he did not stock a television that was "a little" over fifteen inches. *Id.* at 594. An FBI agent trained in cryptanalysis (code breaking) testified that the references to televisions were references to drugs. *Id.*[9]

We held that the *Theodoropoulos* jury could have concluded that these conversations related to a drug transaction in which Barrera supplied drugs to Theodoropoulos. We said the evidence that on the date of one of the conversations Theodoropoulos was contemporaneously arranging a cocaine sale with a third party and went to Barrera's place of employment twice that day could also have supported this conclusion. *Id.*

In Hauser's case, Williams's request for heroin, Hauser's visit to McGlory's house early the next morning, a follow up call that "that was 44," and Hauser's sale of heroin to Williams the same day permits a jury rationally to infer that Hauser and McGlory were discussing heroin, not slippers. From this and the other evidence we have recited, the jury could have also inferred that McGlory had supplied the heroin Hauser sold to Williams.[10]

Hauser relies on *United States v. Stroupe*, 538 F.2d 1063 (4th Cir.1976). There the court held that evidence of a codefendant's visit to the defendant's trailer just prior to a drug transaction with government agents was insufficient proof of the defendant's participation in a conspiracy. In *Stroupe*, there was no evidence that any drugs were obtained from the defendant's trailer. *Id.* at 1065–66. In Hauser's case, agents observed Hauser leaving McGlory's residence stuffing something white into his pocket and McGlory later called Hauser and said "that was 44, right?"

Still, even if he received heroin from McGlory on July 3, 1989, Hauser contends the relationship of buyer and seller, standing alone without any evidence of a prior understanding beyond the mere sales agreement, does not establish a conspiracy. *See Kapp,* 781 F.2d at 1010; *United States v. DeLutis,* 722 F.2d 902 (1st Cir.1983) (evidence that defendant was advised by phone that the "stuff" was ready, and then went to the home of a distributor with $5,000.00 insufficient to establish conspiracy); *United States v. Tramunti,* 513 F.2d 1087, 1112 (2d Cir.) (defendant's single purchase of heroin from alleged coconspirator and statement that he "wanted to get rolling again" held insufficient evidence of participation in conspiracy), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 55, 46 L.Ed.2d 50 (1975).

Here, however, there was evidence beyond a single act connecting Hauser and McGlory to drug trafficking. For example, a jury could believe that the "BroMel," "BM" and "Mel" listed on the owe sheets referred to Hauser. A jury could also believe, based on Agent Rotter's testimony, that the notes seized from McGlory's trash

---

**9.** Unlike the concurrence, we do not read *Theodoropoulos* to require, in all cases, expert testimony decoding drug dealers' slang or jargon before their statements can be introduced in evidence. Under the circumstances of this case, the taped conversations the government offered were relevant. Their weight was for the jury. In the context of all the evidence the jury had before it in this particular case, we think a lay inference that the parties cryptic statements referred to drugs and drug transactions was permissible.

**10.** In its brief, the government does not refer to evidence that the jury also heard about a conversation between Hauser and McGlory relating to artwork. In a telephone conversation dated July 2, 1989, McGlory said to Hauser "Hey, Man, whenever you make it, bring your artwork so I'll have it with me and I'll get it ... get the stuff done to it." Govt.App. at 9. Surveillance agents observed Hauser arrive at McGlory's residence later that evening. McGlory walked down to Hauser's car and Hauser handed him a rolled up piece of paper. Terry Hediger, a Pittsburgh police officer assisting the DEA, testified that the rolled up paper "could have been a painting, could have been some other type of document...." that was a couple feet long. App. at 992. Other evidence showed that McGlory had in fact taken several paintings to Armand's Art Store for framing.

regularly showing large numbers next to Hauser's nickname demonstrate the relationship between McGlory and Hauser was more than that of a one-time buyer/seller. *United States v. Brown,* 584 F.2d 252 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979), another case Hauser relies on, is distinguishable. There, the United States Court of Appeals for the Eighth Circuit considered a sufficiency challenge to evidence against the defendant limited to the following: the defendant was closely associated with those involved in the drug conspiracy; defendant was twice present at or about the time of a drug transaction; the defendant, though unemployed, had a substantial amount of money sewn into his jacket upon his arrest; and the defendant's first name was written on two pieces of paper found in a co-defendant's apartment which the case agent described as "drug notes." *Id.* at 262–65.

The Eighth Circuit held that mere presence at or around the time of a drug transaction and the fact that an unemployed person possesses money were insufficient to establish the defendant's participation in a conspiracy. *Id.* at 264. It then held that the scraps of paper alleged to be "drug notes," standing alone, could not comprise proof of conspiracy beyond a reasonable doubt. *Id.* at 265. The "drug notes" were found in the residence of an alleged coconspirator, but the author and dates written were unknown. The word "blow" and "550" were next to the defendant's first name on one note and an agent testified that "[b]low is a frequent slang term for cocaine." *Id.* Another note had numbers with names behind them, such as Cleo (250), the defendant's name. A government expert testified that some of the numbers on the notes corresponded to prices of drugs. The court concluded that given the inherent ambiguity of the notes and the agent's inability to identify some of the markings, the agent's opinion regarding the meaning of the notes was not sufficiently probative to sustain the conviction. *Id.* at 265.

The notes in the present case are more damning to Hauser than the notes offered against the defendant in *Brown.* The initials "BM," Hauser's nickname, were on a sheet of paper listing "seven salesman." Agent Rotter interpreted the notations on this piece of paper to indicate seven salesman selling thirty-two ounces of heroin at an average of $10,000.00 per ounce, with a profit of $4,000.00 per ounce. *See* Exhibit 100. The other notes had similar notations consistent with these heroin prices. Significantly, BroMel, BroM or BM appears again on a list of seven names on three of the other owe sheets, and on a list of from five to ten names on the remainder. The same names or initials are repeated again and again on each list. A reasonable jury could have inferred that ten pieces of paper found in McGlory's residences or his trash with BroMel, BroM or BM written on them represented drug transactions in which Hauser was involved more heavily than on a one-time sale basis. *See United States v. Ramos,* 861 F.2d 461, 467 (6th Cir.1988) (recognizing probative value of notes, receipts and telephone numbers found in coconspirator's apartment), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 820 (1989). The jury also had the evidence of Hauser's two sales of heroin to Williams.

Though McGlory's recorded conversations with his long time friend Hauser were brief and guarded, often containing little more than cryptic numbers such as "44" and "19–29–75," they provide still other evidence of Hauser's participation in a drug conspiracy with McGlory. At a time when McGlory knew he was under investigation, Hauser suggested they wait until dark before meeting. *See United States v. Gambino,* 926 F.2d 1355, 1362 (3d Cir.) (timing and circumstances of meeting may be sufficiently suspicious to permit reasonable inference of complicity in conspiracy), *cert. denied,* —— U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). Finally, even though the government need not prove that each defendant knew all the details, goals or other participants of the conspiracy, *Theodoropoulos,* 866 F.2d at 593, there were records of calls made from Kulkovit's Pittsburgh hotel room to numbers associated with Hauser.

Although each piece of evidence, taken alone, may not be enough to establish by logical deduction Hauser's participation in the conspiracy, taking all of it together a reasonable jury could infer "that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding." *Kapp,* 781 F.2d at 1010. The owe sheets and guarded conversations between McGlory and Hauser demonstrate the agreement between them. We cannot say that the record "contains no evidence ... from which the jury could find guilt beyond a reasonable doubt." *United States v. McNeill,* 887 F.2d 448, 450 (3d Cir.1989) (quoting *Brandom v. United States,* 431 F.2d 1391, 400 (7th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971)), *cert. denied,* 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990). Nor can we say that this evidence, in its totality, was not substantial. Hauser did more than "keep[ ] bad company." *See Cooper,* 567 F.2d at 255. There was sufficient evidence from which the jury could have concluded that each drug transaction involving Hauser "was a step in achieving the conspiracy's common goal of distributing [heroin] for profit." *Theodoropoulos,* 866 F.2d at 593.

### 2. The Evidence Against Cotton

■ At trial, the government produced evidence showing that Cotton had developed the concept of selling packets of heroin and cocaine together under the trade name "Double Dutch." Detective Causey observed him sell such a combination in a controlled buy. Charles Butler testified that he sold cocaine to Cotton in Cotton's car and that from its trunk Cotton would often obtain large amounts of money to pay Butler. Harris testified about drug transactions in Cotton's car. Harris also said that Cotton used a beeper to communicate with others and told him never to discuss drug transactions over the telephone because their conversations might be overheard or recorded. Williams testified that Cotton told him that he did not sell heroin for under $3,000.00 and if Williams wanted an eighth ounce he should see McGlory. On September 15, 1988, Detectives Pires and Smith of the Pittsburgh Police observed a drug deal between Cotton and Gregory Tempolski take place in Cotton's vehicle. A search of Cotton's vehicle resulted in the seizure of sixteen grams of heroin and $7,200.00 in cash.

On July 8, 1989, McGlory and Cotton arranged a meeting by telephone. When McGlory asked Cotton if he still had some "pizzas (pieces)," Cotton replied that he was "trying to get some now." Govt.App. at 18–19. Surveillance agents observed McGlory enter Cotton's vehicle carrying a small black paper bag, sit there momentarily, and depart the vehicle without the bag.

On or about July 25, 1989, McGlory discovered he was under investigation. On July 28, 1989, McGlory spoke with Cotton and told him "We remodeling the restaurant" and "we might have, uh, one last, uh, she-bang Man. We have a party there for the summer. We may have to ... it might take a while to get it back together.... I wanted to inform you cause, uh, I know you wanted to make sure your party got to eat.... So, it's not good. I got the information for you and whenever you can get out, I can talk to you." *Id.* at 61. Cotton was then selling heroin to Robert Harris on a continual basis. In early August of 1989, Cotton told Harris he would have to cut back on the amount of heroin he was supplying because Cotton's supplier was under investigation by the FBI and had cut back his supply.

The notes seized from McGlory's trash indicated that he was supplying heroin to an individual by the name of "Charley C" or "CC" on a regular basis. *See* Exhibits 100, 101, 103A, 103B, 104A, 105, 105B, 109, 113, 114 and 115. Cotton contends that the name "Charley C" appeared on only one note and at least three other individuals subject to the government's investigation had the initials "CC": Cool Charlie, Coxie Cox and Carla Canda. The note containing the name Charley C. also contained six other names and numbers the jury could believe referred to McGlory's salesmen and his drug profits. *See* Exhibit 100. As set forth in the discussion of Hauser's suffi-

ciency challenge, the format of the notes and the names, initials and amounts written thereon were strikingly similar.

Even if a jury could not reasonably conclude that "CC" or "Charley C" on the owe sheets referred to Cotton, there remains the evidence of Cotton's meeting with McGlory and the transfer of the small black bag, the conversation in what appears to be "coded" language of "remodeling the restaurant" just after McGlory discovered he was under investigation, and Cotton's subsequent cutback of his supply to Harris. The jury could readily find that McGlory was not in the restaurant business at the time this conversation took place. Indeed, there is no evidence McGlory was ever a restaurateur, and this conversation supports an inference that Cotton knew he was "a part of a venture which extend[ed] beyond his individual participation." *See United States v. Prieskorn*, 658 F.2d 631, 635 (8th Cir.1981) (quoting *United States v. Magnano*, 543 F.2d 431, 434 (2d Cir.1976) (citations omitted), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 1101, 51 L.Ed.2d 536 (1977)). Finally, with respect to McGlory's remark that he wanted to assure that Cotton's party "got to eat," the jury had heard testimony from Slade that whenever McGlory wanted to meet with him about selling drugs he would ask if Slade was ready to go to "lunch" or "dinner." App. at 438, 517. Slade said that "it had something to do with eating." *Id.* at 517.

Viewing the evidence in the light most favorable to the government, we hold there is sufficient evidence of Cotton's participation in the conspiracy to sustain his conviction. The government need not prove that each defendant knew all the details, goals or other participants of the conspiracy. *Theodoropoulos*, 866 F.2d at 593. The jury could have inferred the necessary conspiratorial agreement or understanding between McGlory and Cotton from the owe sheets, the recorded conversations about getting "pieces" and "remodeling the restaurant" and the transfer of the black bag. The jury could have also inferred that the

numerous drug deals the evidence showed involving Hauser were steps "in achieving the conspiracy's common goal of distributing [heroin] for profit." *Id.*

### 3. The Evidence Against Kulkovit

■ There is likewise substantial evidence implicating Kulkovit in the conspiracy. There were trips by McGlory to Los Angeles and by Kulkovit and others to Pittsburgh and Thailand, along with the use of aliases and coded language. McGlory, consistently using the alias Timothy Reed over a period of years, was paying Kulkovit in individual installments, usually in even amounts of $2,000.00, each through wire transactions.[11]

It is true that Kulkovit was never caught with heroin in his possession. This case is distinguishable, however, from those cases in which this Court has overturned conspiracy convictions because the defendant was not proven to have had knowledge of the illegal objective of the conspiracy. *See United States v. Terselich*, 885 F.2d 1094, 1096–99 (3d Cir.1989) (no evidence that passenger knew purpose of trip was to transport drugs concealed in hidden compartment of car); *United States v. Wexler*, 838 F.2d 88, 91–92 (3d Cir.1988) (insufficient evidence to conclude that defendant who acted as lookout for truck knew there were drugs in truck). These cases "are inapposite because they concern situations where there was *no* proof that the defendant knew of the existence of the drugs." *United States v. Touby*, 909 F.2d 759, 772 (3d Cir.1990) (emphasis added), *aff'd on other grounds, Touby v. United States*, —— U.S. ——, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991); *see United States v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1102 (3d Cir.) (noting distinction), *cert. denied*, 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989).

It is undisputed that there was overwhelming evidence linking McGlory to heroin trafficking, and he does not contest the

---

**11.** We find meritless Kulkovit's contention that the evidence was insufficient to convict him of money laundering.

sufficiency of the evidence against him. The evidence showed that Kulkovit met with McGlory on numerous occasions, exchanged large sums of money with him, and that the two were clearly involved in some illegal conspiracy, the object of which Kulkovit knew. That McGlory was so heavily engaged in heroin trafficking and so deeply involved in trafficking something with Kulkovit, coupled with the fact that when Kulkovit came to Pittsburgh he called Hauser, a known drug dealer, is sufficient to establish that Kulkovit participated in the heroin conspiracy.

Kulkovit's August 8, 1989 conversation with McGlory is in itself sufficient to lead a reasonable jury to conclude that Kulkovit had knowledge of and voluntarily participated in the conspiracy. McGlory tells Kulkovit "don't say too much on this phone, see, that was another phone I called you from." Govt.App. at 66. Kulkovit refers to someone that can "carry" for McGlory and an "order" for McGlory that McGlory says he doesn't want because he's "under investigation." *Id.* at 67–68. McGlory also tells Kulkovit to "[p]ut the shit down in the ice box or something. It ain't gonna spoil." *Id.* at 68. He also tells him to tell the "feds" that the $2,000.00 wire transfers related to an investment, and that they might arrest him while he's sitting down there "eating." *Id.* at 68–69. The evidence against Kulkovit that he conspired with McGlory to possess and distribute heroin was sufficient to support his conviction.

### B. *Challenges to the Admission of Notes Seized From McGlory's Residences and his Trash*

On grounds of authenticity, hearsay, or both, all four defendants object to the admission of the notes and scraps of paper seized from McGlory's trash and his residences.[12]

---

**12.** McGlory challenges the admission of Exhibits 100–15 and 136–38 on grounds of authenticity and hearsay. Hauser challenges the admission of Exhibits 100–12 on hearsay grounds.

### 1. Authenticity

McGlory objected at trial to the introduction of handwritten notes seized from his garbage and residences for lack of authentication because the handwriting expert had insufficient handwriting exemplars to determine the author of some of the writings. The district court, nevertheless, found the notes were properly authenticated. We review the district court's ruling as to proper authentication for abuse of discretion. *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 285 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The admission or exclusion of evidence is a matter particularly suited to the broad discretion of the trial judge." *In re Merritt Logan, Inc.*, 901 F.2d 349, 359 (3d Cir.1990).

Under Federal Rule of Evidence 901 "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). For authentication or identification of the notes the government could rely on "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated," Fed. R.Evid. 901(b)(3), or on "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed.R.Evid. 901(b)(4); *see Link v. Mercedes–Benz of North America*, 788 F.2d 918, 927 (3d Cir. 1986).

We stated the standard for authentication based on circumstantial evidence in *Link:*

> [T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility. Once a prima fa-

Cotton challenges the admission of Exhibits 100–15 on hearsay grounds. Kulkovit adopts the challenges of McGlory and Cotton.

cie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court The only requirement is that there has been substantial evidence from which they could infer that the document was authentic.

*Link,* 788 F.2d at 928 (quoting *United States v. Goichman,* 547 F.2d 778, 784 (3d Cir.1976)) (emphasis omitted).

■ Viewing the record in its entirety, there was sufficient evidence from which the jury could find that McGlory authored the notes in question despite the government's inability to establish fully McGlory's authorship by expert opinion. The evidence showed that the notes were seized from the trash outside of McGlory's known residences during the course of the charged conspiracy or during the September 9, 1989 search of his residences. Some of the notes from the trash were torn from a notebook found in one of his residences. Some of the notes were contained in the same garbage bag as other identifying information. Some of the notes were written on note paper from hotels at which McGlory stayed during the course of the conspiracy. Although he could not be conclusive, the government's handwriting expert did testify to numerous similarities between the writing on several of the notes and a handwriting exemplar McGlory had provided.[13] Finally, the notes were similar in form and contained similar amounts as well as initials of persons listed in McGlory's private phone books known to associate with him.

The evidence demonstrated that Exhibits 100 and 110, which were seized from the trash at 236 South Negley Avenue on May 1, 1989, were torn from government Exhibit 113, a notebook seized from the same property on September 8, 1989. Exhibit 101 is written on a bank deposit slip which corresponds to an account utilized by McGlory. A wire transfer receipt dated April 12, 1989 showing the transfer of money from McGlory to Kulkovit was found in the same garbage bag as Exhibits 100 and 101. Exhibit 102 is a piece of notepaper with the message "tell We I never called because the newspaper never came in." The evidence shows "We" is the appellant Kulkovit. Although the handwriting expert testified that McGlory did not write Exhibit 102, McGlory had his mother take and relay messages between himself and Kulkovit.

Exhibits 103, 103A and 103B, recovered from the trash at 4267 Bryn Mawr Road, were written on notepaper from a Stouffer's tablet. McGlory stayed at a Stouffer's hotel on several occasions when he travelled to Los Angeles during the course of the conspiracy. Exhibits 136 and 138 were also written on Stouffer's note paper. Exhibits 104, 104A and 104B, obtained from the trash at 4267 Bryn Mawr Road, were written on notepaper obtained from the Westin Hotel in Detroit. McGlory stayed at this hotel in July 1988. The handwriting on Exhibits 104 and 104A was identified by the government's handwriting expert as being similar to McGlory's.

Exhibits 105, 105A and 105B were taken from the trash at 4267 Bryn Mawr Road. The names and initials contained on these three exhibits are similar to those that appear on the exhibits discussed above. The handwriting on Exhibit 105 was identified as being similar to that of McGlory. Exhibit 106 was seized from the trash at 4267 Bryn Mawr Road. The initials on this exhibit are similar to the ones on the exhibits discussed above. Exhibit 107, recovered from the trash at 4267 Bryn Mawr Road, consists of notes written on notepaper taken from Bally's Hotel in Las Vegas. Other evidence indicates that McGlory made trips to Las Vegas during the relevant time period. The initials in columns on the back of Exhibit 107 are similar to the initials on the other exhibits. A notation on the front of Exhibit 107 refers to "Cellular One." A

---

**13.** *See* Exhibits 104, 104A, 105, 109 and 112. He could offer no opinion due to the insufficiency of the handwriting samples on Exhibits 101, 103, 103A, 103B, 104B, 105A, 105B, 106, 107, 108, 111, 114, 116, 136 and 138. With respect to Exhibit 137, he could find no evidence that McGlory wrote it. The handwriting expert did not testify concerning the handwriting on Exhibits 100, 102, 110 and 113.

bill from Cellular One was found in McGlory's trash in April 1989.

Exhibit 108 is a note recovered from the trash at 4267 Bryn Mawr Road. The initials and notations written on it are similar to the ones that appear on the exhibits discussed previously. Exhibit 109 is a note seized from the trash at 236 South Negley Avenue. The initials written on it are similar to the initials that appear on the other exhibits. The handwriting expert testified that the handwriting on Exhibit 109 is similar to the handwriting exemplar provided by McGlory.

Exhibit 111 was also obtained from the trash at 236 South Negley Avenue and contains numbers, initials and notes in the same format as the other notes. Exhibit 112 is a spiral notebook found during the search of 4267 Bryn Mawr Road. Several of the pages in Exhibit 112 contain lists of initials and numbers similar to that found in the other notes. The handwriting expert testified that there were similarities between the handwriting in Exhibit 112 and that of McGlory.

Exhibit 113 is a spiral notebook found during the search at 236 South Negley Avenue. Several pages contain columns of names and numbers similar to those found on the other notes. Other pages in the notebook contain handwritten references to Precision Doors, KYE and "Peice [sic] on car Ted McWm." Other evidence showed McGlory's association with Precision Doors and KYE and that he had his Porsche repaired at Ted McWilliams' garage. Government Exhibit 114 is a business card for a furrier, which was found during the search at 236 South Negley Avenue. The list of initials on the back is similar to those found on the other exhibits. Exhibit 115 was found during the search at 236 South Negley Avenue and contains lists of initials and figures similar to the other exhibits.

In addition, Special Agent Rotter testified that the numbers in the various documents, when considered each along with the others, show that McGlory was paying approximately $6,000.00 an ounce for heroin and selling it for $10,000.00. He also testified that the notes referred to ounce quantities purchased by various individuals and the amount of profit McGlory realized from the sale. The initials and names contained in the documents also link them to McGlory. "[A] document ... may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known particularly to him." Fed.R.Evid. 901 advisory committee's note, example 4. As discussed above, Exhibits 101, 104, 104B, 106, 107, 108, 109, 112, 113, 114, and 115 contain similar lists of from five to ten names with corresponding notations. For example, Exhibit 100 referred to seven salesman in a column of initials: K, CC, BM, D, MC, MK and Go. Exhibit 103A contains the initials Kil, BM, M, Go, S (illegible) and CC in column form. Exhibit 103 contains the names Cerly, BroMel, Charley C, GooGoo, Killer, G(illegible) and Norma in column form. The jury could infer from the other evidence set out in our analysis of Hauser and Cotton's sufficiency arguments that some of these names and initials referred to Cotton and Hauser. Other evidence showed McGlory's association with "Killer," "Go–Go" and Norma Pruitt and their names were listed in his personal phone book.

Exhibit 136, a sheet of Stouffer's notepaper, was seized from the trash at 4267 Bryn Mawr Road residence. It contained the name "We" and a Bangkok telephone number. Exhibit 137 is a piece of notepaper seized on January 31, 1989 from McGlory's trash containing the name We and a Bangkok telephone number. Evidence introduced at trial indicated that We (Kulkovit) was in Thailand just prior to the time this note was seized and that McGlory called this number during that time. Exhibit 138 is another piece of Stouffer's notepaper with the name Yongyos Thauthong written on it. The evidence showed that McGlory met with Thautong in Pittsburgh, wired money to him, and that Thauthong was associated with Kulkovit in Los Angeles.

Considering all the surrounding circumstances, the documents in this case (Exhibits 100–15, 136–138) could be authenticated by their contents, and thus precise hand-

writing identification is not required. In *United States v. Reyes*, 798 F.2d 380, 383 (10th Cir.1986), the defendant objected to the admission of handwritten notes on authenticity grounds. The notes were seized from the defendant's residence and their contents included the name of the defendant, initials of his coconspirators, notations of numbers and ounces and phone numbers. The court found no abuse of discretion in the admission of the notes. It stated: "The source of the notes and the correspondence of information contained in the notes to members of the conspiracy provided ample foundation for their admissibility." *Id.* at 383. As in this case, "the contents of the notes indicated that they were written by someone involved in the conspiracy." *Id.* (citing *United States v. Drougas*, 748 F.2d 8, 26 (1st Cir.1984); *United States v. De Gudino*, 722 F.2d 1351, 1356 (7th Cir.1983)).

Similarly, in *United States v. Wilson*, 532 F.2d 641, 644–45 (8th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), the court admitted the contents of two notebooks found in a house that an informer said was being used in a narcotics operation. Although the author was unknown, the court found that the contents of the books, nicknames of the defendants and code terms referring to heroin, were sufficient for authentication purposes. And in *United States v. Luschen*, 614 F.2d 1164, 1174 (8th Cir.), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980), a prosecution for conspiracy to distribute cocaine, the trial court allowed expert testimony as to the meaning of notations in a notebook found in the defendant's bedroom. The court allowed the contents of the writing to be used in determining the identity of the declarant for purposes of Rule 901 since dates and prices listed in the notebook corresponded to the dates of drug transactions in the case. Handwriting analysis was not required. *Id.* at 1174.

More directly on point, in *United States v. Baker*, 855 F.2d 1353 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989), the defendant objected, on the grounds of authenticity, to the admission of items collected from a coconspir-ator's garbage. The court held that a proper foundation had been laid for their admission. All of the contested items came from large trash bags. Some of the items "such as bills, notes and receipts contained distinctive characteristics linking the[ ] items to the" coconspirators. *Id.* at 1359. Further, some of the documents in the garbage contained one of the coconspirator's address. The court also found persuasive the testimony of a police officer that the garbage came from the coconspirator's house. *Id.*

Here, there was testimony concerning the procedures used to pickup and search the trash. Although the handwriting on the notes was not definitively identified as that of McGlory, all of the notes contained distinctive characteristics linking them to him. Other items found in the trash such as letters, plane tickets and bills linked the trash to McGlory. Additional handwritten notes from the trash besides the owe sheets referred to Armand's Art Gallery, McGlory's Porsche, C & E Fashions, Timothy Reed and Linda Jewelry. The evidence linked McGlory to all of these references. Since the notes were likely to be what the government said they were, we cannot say that the district court abused its discretion in deciding that Exhibits 100–15 and 136–38 were authenticated.

### 2. Hearsay

Notwithstanding authentication, the notes would still have to be excluded if the assertions in them are hearsay that does not fall under any exception to Federal Rule of Evidence 802 precluding the admissibility of hearsay. At trial, all four defendants objected to the admission of the notes seized from McGlory's trash or his residences on grounds of hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c); *United States v. Reynolds*, 715 F.2d 99, 101 (3d Cir.1983). A "statement" can be either a written or oral assertion or any nonverbal conduct intended as an assertion. Fed.R.Evid. 801(a).

The district court ruled that the notes were not hearsay because they were not offered for the truth of the matter asserted. Whether documents are hearsay is an issue of law subject to our plenary review. *See Reynolds*, 715 F.2d at 101–05.

■ The government contends that the notes were offered as circumstantial evidence linking McGlory, Cotton and Hauser to a narcotics conspiracy and thus do not constitute hearsay. The defendants contend that the notes were offered for the truth of the matter asserted. The government had its expert witness, Special Agent Rotter, interpret the writings on the notes. Rotter told the jury that the notes were "owe sheets" referring to drug transactions.

The government relies principally on *United States v. Moscatiello*, 771 F.2d 589 (1st Cir.1985), *vacated on other grounds*, 476 U.S. 1138, 106 S.Ct. 2241, 90 L.Ed.2d 688 (1986), in arguing that the notes in question were not offered for the truth of the matter asserted. In *Moscatiello*, the government had searched a warehouse and found two notebooks, author unknown, that contained pages of notes showing that certain bales of marijuana of certain weights were assigned to certain persons. *Id.* at 604. The court held that there was no issue as to the "truth" of the assertions that particular bales of marijuana were assigned to particular persons. Because the notebook was merely used as evidence linking certain defendants to the marijuana operation, the court held it was not hearsay. *Id.* at 605.

Similarly, in *United States v. Wilson*, 532 F.2d 641 (8th Cir.1976), *cert. denied*, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), notebooks were found in the search of an apartment in which other evidence showed drugs were sold. The author or authors of the handprinted notes was unknown. The court held that the notes were not hearsay because the defendants' delivery, purchase or sale of a particular

amount of heroin on a specific date was not at issue. *Id.* at 644–46.

This Court, however, has disfavored the admission of statements which are not technically admitted for the truth of the matter asserted, whenever the matter asserted, without regard to its truth value, implies that the defendant is guilty of the crime charged. In *Reynolds*, 715 F.2d 99, we held that statements containing express assertions not offered for their truth may contain implied assertions that qualify as hearsay because the truth of the implied assertions is at issue and relevant to guilt. We encounter this problem when:

> the matter which the declarant intends to assert is different from the matter to be proved, but the matter asserted, if true, is *circumstantial* evidence of the matter to be proved.

*Id.* at 103 (quotation omitted) (emphasis added). In *Reynolds*, co-defendants were indicted for possession and conspiracy to possess and cash a stolen unemployment compensation check. The government sought to use the following statement of one co-defendant (Reynolds) to the other (Parran): "I didn't tell them [the postal inspectors who arrested him] anything about you." *Id.* at 101. The government did not try to prove the truth of the statement. Instead, the government offered the statement as circumstantial evidence of a conspiracy between Reynolds and Parran and their joint participation in the underlying substantive offenses. *Id.* at 103. We held the statement inadmissible because the government offered it to "prove the truth of the assumed fact of defendant's guilt implied by its content." *Id.* We also held that the statement was offered for the implied assertion that Parran was involved in the crimes charged. *Id.* at 104.

Under the *Reynolds* rationale, this case is distinguishable from *Moscatiello* and *Wilson*. Here, Agent Rotter testified that the notes represented owe sheets showing the alleged sale or fronting to Cotton, Hauser and others of large amounts of heroin on a continuous basis, instead of just on a one time sale basis.[14] Thus, the statements

---

**14.** Agent Rotter gave his expert opinion on Exhibits 100, 103A, 103B, 104, 104A, 104B, 105A, 105B and 110.

in the notes, although not technically assertions by McGlory, were used to imply the guilt of the defendants.

We also think that Agent Rotter, in his extensive testimony, testified as to the truth of the statements written on the notes. He testified that in his opinion the notes revealed that McGlory was purchasing heroin in thirty-two ounce quantities, at approximately $6,000.00 an ounce and selling it for $10,000.00 an ounce. Agent Rotter even testified to the accuracy of McGlory's alleged calculations and found a mathematical error.

In *United States v. Mahar*, 801 F.2d 1477, 1490–91 (6th Cir.1986), the prosecution argued that it was not offering handwritten notes for the truth of the matters asserted therein. The notes appeared to focus on a Medicaid investigation of the defendants' clinic. During his closing argument to the jury, counsel for the government characterized the notes as "a game plan for avoiding detection of fraud." *Id.* at 1491. The United States Court of Appeals for the Sixth Circuit held that the notes were hearsay because the prosecutor intended to convince the jury of the truth of several statements in the notes and the jury may have relied on those statements as evidence of the fraud scheme charged. *Id.* at 1491–92. Agent Rotter's explanations in this case had a similar effect on the jury. As in *Mahar*, the notes here were offered to prove more than just the fact that McGlory was associated with Hauser and Cotton. Thus, these notes were hearsay and should not have been admitted unless they come within one of the exceptions to the hearsay rule.

Nevertheless, here the district court correctly ruled that Exhibits 102, 136, 137 and 138 were not offered for the truth of the matter asserted and thus do not constitute hearsay. Exhibit 102 has a message for "We" written on it, and Exhibits 136 and 137 each contain "We's" name and a phone number. They were offered only as circumstantial evidence of McGlory's association with "We." Exhibit 138 contained the name Yongyos Thautong and was offered merely as circumstantial evidence of

McGlory's association with him. *See United States v. Panebianco*, 543 F.2d 447, 456–57 (2d Cir.1976) (entry in coconspirator's address book including nickname of other coconspirator offered as evidence of "additional transactional link" in conspiracy and not for truth of matter asserted), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 1129, 51 L.Ed.2d 553 (1977); *United States v. Ruiz*, 477 F.2d 918–19 (2d Cir.) (per curiam) (slip of paper bearing nickname and telephone number of defendant found on person of alleged coconspirator admitted merely to support inference that defendant and coconspirator knew each other), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973); *Brown v. United States*, 403 F.2d 489, 491 (5th Cir.1968) (same), *cert. denied*, 397 U.S. 927, 90 S.Ct. 932, 25 L.Ed.2d 106 (1970).

Exhibits 102, 136, 137 and 138 were properly admitted because they were not hearsay in the context in which they were offered. Exhibits 100, 101, 103, 103A, 103B, 104, 104A, 104B, 105, 105A, 105B, 106, 107, 108, 109, 110, 111, 112, 113, 114 and 115 constitute hearsay unless they fall within an exception to the hearsay rule, the subject to which we now turn.

### 3. Coconspirator Exception to the Hearsay Rule

Federal Rule of Evidence 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not inadmissible hearsay as to that party. Four requirements must be met before statements can be admitted under this exception. It must appear: (1) that a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. The district court must be able to find these requirements by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *see United States v. Gambino*, 926 F.2d 1355, 1361 (3d Cir.),

*cert. denied,* ——— U.S. ———, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). Our review of the sufficiency of the evidence to permit such a finding is plenary.[15]

■ In determining preliminarily whether the evidence is sufficient to show the existence of the conspiracy, the court can, however, consider the hearsay statements themselves. *Bourjaily,* 483 U.S. at 178–79, 107 S.Ct. at 2780; *Cruz,* 910 F.2d at 1081. Though this at first seems curious, in *Bourjaily,* the Supreme Court outlined the inductive logic that supports this rule:

> [I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary factfinding is not therefore required.

*Bourjaily,* 483 U.S. at 179–80, 107 S.Ct. at 2780–81.

The Court expressly declined, however, to decide whether a trial court could rely "solely upon [the declarant's] hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence." *Id.* at 181, 107 S.Ct. at

2781. This Court has not yet had an opportunity to reach that issue, *see Gambino,* 926 F.2d at 1361, and here again we need not reach it because there is sufficient evidence, when combined with the hearsay statements, to induce the existence of a conspiracy and so establish that fact by a preponderance of the evidence.[16]

We recognize that "[c]ourts have been chary of inferring drug conspiracies from nothing more than scraps of paper which the government called records, particularly when those records were disorganized, or found outside the defendant's possession or formed the *whole* of the government's evidence." *United States v. Hays,* 899 F.2d 515, 518 (6th Cir.) (emphasis added) (citation omitted), *cert. denied,* ——— U.S. ———, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990). This is not such a case. As to the existence of the conspiracy and the four defendants' participation therein, we have already outlined the evidence that each defendant was a coconspirator in rejecting challenges to the sufficiency of that evidence. *See supra* at 321–28. It follows necessarily that the evidence establishes the existence of a conspiracy by a mere preponderance and also that McGlory, Cotton, Hauser and Kulkovit were members of the conspiracy.

■ The defendants contend, however, that the record does not support the government's assertion that the declarant was McGlory.[17] In this connection, we re-

**15.** In *United States v. Cruz,* 910 F.2d 1072, 1081 n. 11 (3d Cir.1990), *cert. denied,* ——— U.S. ———, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991), we held that when a district court finds that a conspiracy existed for purposes of Rule 801(d)(2)(E), we review its finding under the clearly erroneous standard. When the district court does not make such a finding, we must decide whether the record supports a finding of conspiracy. The lack of an explicit finding does not render the district court ruling reversible, however, because " 'the necessary threshold determination is implicit in the court's decision to send the case to the jury.' " *Id.* (quoting *United States v. Ammar,* 714 F.2d 238, 247 (3d Cir.) (citations omitted), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)). Here, since the district court held that the notes were not hearsay, it did not make a conspiracy finding under the coconspirator exception. Accordingly, we

must decide whether the record can support such a finding.

**16.** Defendant Hauser's reliance on *United States v. Levy,* 865 F.2d 551, 556 (3d Cir.1989) (in banc) for the proposition that the government must meet its burden with "[i]ndependent evidence corroborating the existence of the conspiracy and the parties' participation in it," is misplaced. *See* Brief for Appellant Hauser at 16. *Levy* was decided under a standard enunciated by this Court prior to *Bourjaily* and specifically declined to consider the retroactive effect of *Bourjaily.* *Cruz* and *Gambino* now exemplify the use of the *Bourjaily* standard in this Circuit.

**17.** If the evidence establishes that McGlory is the author of the exhibits, they are admissible against him as admissions by a party opponent under Rule 801(d)(2)(A) even if the requirements of the coconspirator exception are not

visit the fact that the government's handwriting expert was unable to form a definite opinion as to the identity of the writer on many of the notes.

Hauser points to *United States v. Mouzin*, 785 F.2d 682 (9th Cir.), *cert. denied*, 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 577 (1986). There, the district court admitted a ledger that recorded drug transactions under Rule 801(d)(2)(E). The only evidence linking a coconspirator as author of the ledgers was the location of the ledger in the coconspirator's house and his fingerprints, along with fingerprints of many others, on the ledger. The United States Court of Appeals for the Ninth Circuit reversed the district court's ruling and held that where the government relies on a handwriting expert to identify the declarant, and the expert cannot positively "link" the questioned writing to the putative declarant, the writing is not admissible under the 801(d)(2)(E) exception. *Id.* at 692–93.

In *United States v. Schmit*, 881 F.2d 608, 613–14 (9th Cir.1989), however, the Ninth Circuit construed its decision in *Mouzin* narrowly. In *Schmit*, pages from a desk top calendar were found in the home of the person the government sought to identify as the declarant. Notations on the calendars contained references to a distinctive code word "puppy" used by the defendant to refer to phenyl–2–propanone, and recorded payments of large sums to "Dad." It was conceded that the defendant objecting to the admission of the evidence was the declarant's father. *Id.* at 614. The Ninth Circuit rejected the defendant's reliance on *Mouzin* for the proposition that the government's failure to identify authorship rendered the evidence inadmissible under Rule 801(d)(2)(E). It said that while there was other proof of the declarant's identity in the case before it, in *Mouzin* there was *no* other evidence establishing "the requisite relationship of the declarant to the conspiracy." *Schmit*, 881 F.2d at 613 n. 6.

Furthermore, *Mouzin* was decided without the benefit of the Supreme Court's decision in *Bourjaily* which clarified the standard of proof required to establish the elements of a conspiracy for the admission of coconspirators' statements as a "preponderance of the evidence." *Bourjaily*, 483 U.S. at 175–76, 107 S.Ct. at 2778–79. This Court accepted the preponderance standard prior and subsequent to *Bourjaily*. In *United States v. Gibbs*, 739 F.2d 838 (3d Cir.1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985), we stated "this preponderance standard simply requires the prosecution to present sufficient proof so that the trial judge may find 'that the existence of the contested fact is more probable than its nonexistence.'" *Id.* at 843 (quotation omitted). We recently reiterated this preponderance standard in *Gambino*, 926 F.2d at 1360 and *Cruz*, 910 F.2d at 1081 n. 11.

We are guided in our application of the preponderance standard to the facts of this case by *Cruz*. There we admitted the statement of an unidentified declarant against two defendants under Rule 801(d)(2)(E) because the statement itself suggested the necessary conspiratorial connection between the declarant and the defendants. We said: "Unidentifiability may be important in some situations, but when the statement itself and the surrounding circumstances provide sufficient evidence of reliability, unidentifiability will not be particularly important." *Id.* at 1081 n. 10. Several other courts have held that absolute proof of authorship is not essential to the invocation of the coconspirator exception. *See United States v. Helmel*, 769 F.2d 1306, 1313 (8th Cir.1985); *United States v. De Gudino*, 722 F.2d 1351, 1356 (7th Cir.1983). "What is essential is that the government show that the unknown declarant was more likely than not a [co]-conspirator." *Helmel*, 769 F.2d at 1313.

Under these guidelines, we briefly review the evidence of McGlory's authorship. Exhibit 100 referred to "7 salesmen" and "32 plots." Agent Rotter testified that in his opinion "32 plots" referred to thirty-two ounces of heroin. The evidence also showed that a bag containing heroin residue recovered from McGlory's trash could

met. *See Savarese v. Agriss*, 883 F.2d 1194, 1200–01 (3d Cir.1989).

have contained thirty-two ounces. Exhibits 101 and 110 were, in an expert's opinion, torn from Exhibit 113, a notebook seized during the search of 236 South Negley Avenue. Exhibit 101 was written on a torn deposit slip matched to an account of McGlory's. Exhibits 103, 103A and 103B were written on Stouffer's notepaper. Hotel records showed that McGlory stayed at a Stouffer's Hotel in Los Angeles on several occasions during the course of the conspiracy. Exhibits 104, 104A and 104B were written on notepaper from the Westin Hotel in Detroit, another hotel McGlory stayed at during the relevant time period.

Exhibit 105 contains a list of seven names in the same format as on the other notes. Exhibit 105A contains the name Chubb. Norman Gomez is listed in McGlory's phone book under this nickname. Exhibit 105B contains the initials "CC." Agent Rotter testified that in his opinion Exhibits 105A and 105B represented money owed for drugs. The name BroMel or BroM was written on Exhibits 104, 105, 106, 109 and 112. Hauser was listed in McGlory's phone book as BroMelvin. Exhibit 107 had "Cellular One" written on it, in addition to initials and notations in the same format as those discussed above. A Cellular One phone bill in McGlory's name was recovered from his trash in April 1989. Exhibits 108 and 109 contain initials and notations similar to those discussed above such as Kill, BroM, CC and Go.

Exhibit 110 was torn from Exhibit 113 and contains initials and notations similar to those discussed above. Specifically, the number 313 appears in the computations on Exhibit 110 and on Exhibits 100, 104A and 104B. Exhibit 111 contains the initials "CC" and "15K" and appears to describe a chain of distribution. Exhibit 112 is a notebook recovered during the search of 4267 Bryn Mawr Road and contains names and notations similar to those identified above such as BroMel. Exhibits 113, 114 and 115 were recovered during the search of 236 South Negley Avenue and again, like the exhibits discussed above, contain initials of McGlory's known associates and numbers in columns. Exhibit 113 is a notebook. Other pages written on in similar handwriting in the notebook contain references to Precision Doors, KYE, BroMel and Ted McWilliams, a name found on documents pertaining to the maintenance of McGlory's Porsche. Moreover, with respect to Exhibits 104, 104A, 105, 109 and 112, the expert testified as to "numerous similarities" between the writings thereon and exemplars of McGlory's writing.

We believe the government has established " 'reasonable grounds' for concluding that, more probably than not," *United States v. Caputo*, 758 F.2d 944, 948 n. 1 (3d Cir.1985), McGlory authored the notes in question. It appears to us that only a coconspirator, such as McGlory, would have sufficient knowledge of McGlory's narcotics business to be able to record the information contained on the exhibits. *See Helmel*, 769 F.2d at 1313–14; *De Gudino*, 722 F.2d at 1356.

With respect to the third requirement, the indictment in this case limited the conspiracy in time between July 1986 and September 8, 1989. The notes were undated. Keeping in mind *Bourjaily's* instruction that "[t]he sum of an evidentiary presentation may well be greater than its constituent parts," *Bourjaily*, 483 U.S. at 180, 107 S.Ct. at 2781, we hold that the evidence demonstrates by a preponderance that the notes were made during the course of the conspiracy. This case differs from *United States v. Jannotti*, 729 F.2d 213 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1984), a case relied on by Hauser. There, we held inadmissible tapes of telephone calls indisputably made *before* the date of the charged conspiracy. *Id.* at 219.

Here, when all the evidence is considered, it can reasonably be inferred that the notes were made during the course of the conspiracy. They were seized during the timeframe the government alleged McGlory was purchasing heroin through Kulkovit and selling it through Hauser and Cotton. Exhibit 100 was retrieved on May 1, 1989 from the same garbage bag that contained a Western Union receipt of a wire transfer from McGlory to Kulkovit dated April 12, 1989. Exhibit 101 was re-

covered from that same garbage bag and was written on a deposit slip which matched with a deposit McGlory made on March 7, 1989. Exhibit 110, which was torn from the same notebook as Exhibit 101, was recovered from the same bag. Exhibits 103, 103A, 103B, 104, 104A and 104B were written on notepaper from hotels the evidence shows McGlory stayed at during the course of the conspiracy. Exhibit 107 was written on notepaper from Bally's Hotel in Las Vegas. The evidence shows McGlory stayed in Las Vegas during the course of the conspiracy. Exhibit 107 also has Cellular One written on it, a phone service the evidence shows McGlory used during the course of the conspiracy. Exhibit 113 refers to Precision Doors, KYE and Ted McWilliams. The evidence shows McGlory had dealings with these businesses or persons during the course of the conspiracy.

Further, Exhibits 100, 101, 103A, 103B, 104, 104B, 105, 106, 107, 108, 109, 112, 113, 114 and 115 all contain similar lists of names/initials and numbers in column form. Agent Rotter testified that the notations referred to the sale or fronting of ounce quantities of heroin to the named individuals and profits therefrom. When considered together, the similarities between these notes, all characterized as owe sheets, are striking. Although Exhibits 103 and 110 contain no initials, the numbers in the calculations on those exhibits recur throughout the other exhibits. We conclude that it is more likely than not that the records on Exhibits 100, 101, 103, 103A, 103B, 104, 104A, 104B, 105, 106, 107, 108, 109, 110, 113, 114 and 115 were kept during the course of the conspiracy.

■■■ Exhibits 105A, 105B and 111, however, do present a problem. Exhibits 105A and 105B contain different initials and numbers in a different format than those on the owe sheets. Agent Rotter testified that in his opinion the notes did not refer to drug transactions, but possibly money owed for drugs. Although Exhibit 111 contains numbers such as "15K" they are not written in columnar form as on the other owe sheets. Agent Rotter did not render an opinion on this exhibit. Thus, it is difficult to determine that these notes were made during the conspiracy. Still, neither Cotton's, Hauser's nor Kulkovit's names or initials were written on 105A and only CC was written on 105B and 111.[18] Thus, as to them, Exhibits 105A, 105B and 111 had minimal significance, if any. Additionally, the jury heard other evidence of McGlory's alleged loansharking business and thus could have believed McGlory's contention that Exhibits 105A and 105B in particular referred to loans of money. In making non-constitutional "harmless error" determinations as to the admission of evidence, we must determine whether it is "highly probable that the evidence ... did not contribute to the jury's judgment of conviction." *Government of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir.1976), *quoted in Jannotti*, 729 F.2d at 219–20.[19] Because of the other evidence implicating these defendants in the conspiracy, and the lack of significance of the three exhibits as against Cotton, Hauser and Kulkovit, we hold that the admission of these three exhibits was harmless.

Finally, defendant McGlory argues that the writings at issue were not made in furtherance of the conspiracy. We disagree. In *United States v. Deluna*, 763 F.2d 897 (8th Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985), the court held it was not clearly erroneous for the district court to find that "cryptic writings containing code names, telephone

---

18. The presence of the initials "CC" on the various exhibits was not a necessary part of our rejection of Cotton's sufficiency claim. *See supra* at 326–27.

19. In *Jannotti* we stated that the "high probability" standard of appellate review is different from the harmless beyond a reasonable doubt standard used to determine the harmlessness of constitutional errors. *Jannotti*, 729 F.2d at 220 n. 2. (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). While "[h]igh probability requires that we have a sure conviction that the error did not prejudice the defendants," we need not disprove "every 'reasonable possibility' of prejudice." *Id.* (quotation omitted); *see United States v. Casoni*, 950 F.2d 893, 917–18 (3d Cir.1991) (employing standard).

numbers and references to disbursements of moneys" were records made in a casino skimming operation and thus were made "in furtherance of the conspiracy." *Id.* at 909; *see United States v. Shursen,* 649 F.2d 1250, 1256 (8th Cir.1981) (ledgers containing notes of wagering transactions relating to gambling operation were made in furtherance of conspiracy because records were necessary to gambling operation). Agent Rotter testified in this case that the documents show the amount McGlory was paying, the number of ounces purchased by various individuals and the amount of McGlory's profit. Accordingly, we hold that the district court had reasonable grounds for finding that the exhibits were more probably than not records of McGlory's drug business and thus documents prepared in furtherance of the conspiracy.

Thus, our tedious and repetitive, but necessary and detailed, review of the evidence leads us to believe that a proper foundation was laid for the admission of Exhibits 100, 101, 103, 103A, 103B, 104, 104A, 104B, 105, 106, 107, 108, 109, 110, 112, 113, 114 and 115 under Rule 801(d)(2)(E).

## C. *Cotton's Challenge to the Admission of Butler's Testimony*

During the trial in this case, the district court admitted the testimony of Charles Butler, a convicted felon, that Cotton had bought large amounts of cocaine from him on a regular basis during the time the conspiracy was ongoing, and that Cotton told him that he used the cocaine along with heroin to market a product under the trade name "Double Dutch." App. at 409–13, 420–21. Cotton argues that this evidence was not relevant to the conspiracy charge, was inadmissible evidence of other bad acts under Federal Rule of Evidence 404(b) and was more prejudicial than probative under Federal Rule of Evidence 403.

Federal Rule of Evidence 404(b) provides: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b). The possible uses of "other crimes" evidence listed in Rule 404(b) "are not the only proper ones." *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). We have held that Rule 404(b) generally prohibits "evidence of prior criminal acts which has no purpose except to infer a propensity or disposition to commit crime." *Id.* at 1019 (quoting *Government of Virgin Islands v. Toto,* 529 F.2d 278, 283 (3d Cir. 1976)). We must inquire whether the evidence is probative of a material issue other than character. *Id.* Apart from meeting the requirements of Rule 404(b), other acts evidence must also be evaluated against the unfair prejudice standard of Rule 403.[20] *Government of Virgin Islands v. Harris,* 938 F.2d 401, 419 (3d Cir.1991). We review the district court's admission of other acts evidence for abuse of discretion. *Id.* at 407.

Cotton relies on *United States v. Schwartz,* 790 F.2d 1059 (3d Cir.1986) (per curiam). In that case, the defendant was charged with a *single* count of distributing cocaine and the district court admitted a witness' testimony about prior cocaine sales to the defendant in large amounts over a period of five years. This Court reversed the district court and held the evidence inadmissible under Rule 404(b). Other than the government's reference to the "entire laundry-list of possible exceptions" under Rule 404(b), there was no indication in the record as to the purpose for which the evidence was offered. *Id.* at 1061. Assuming the relevance of the prior sales, we held this evidence was "other crimes" evidence and its relevance to any

---

**20.** Federal Rule of Evidence 403 provides: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed.R.Evid. 403.

issue other than "character/propensity" was marginal while "the prejudice to the defendant was very great." *Id.* at 1062. The unfair prejudice in *Schwartz* arose from the fact that the testimony of prior sales suggested the defendant was a large scale supplier of cocaine to high school students, while the indictment only charged the defendant with "giv[ing] away a small quantity of cocaine in a social setting." *Id.* Accordingly, we held the evidence should have been excluded under Rule 403. *Id.*

In this case, in contrast, the government articulated a specific purpose for the admission of Butler's testimony under Rule 404. It proffered the testimony because it:

> ties directly into ... not only the substantive counts, but also the heroin conspiracy, because Mr. Cotton is indicating that he is mixing [the cocaine] with heroin and selling it, and the quantities of heroin he's buying would be consistent with similar quantities of heroin and would fit within the theory of the government's case.

App. at 417. Thus, Butler's testimony was probative on the issue of Cotton's participation in the charged heroin conspiracy. Since Cotton was purchasing five to ten ounces of cocaine a week from Butler, he would need a source of heroin in an equal amount to combine the cocaine and heroin as "Double Dutch." His alleged need for heroin was consistent with Agent Rotter's testimony that the owe sheets represented large heroin transactions between McGlory and Cotton.

Butler's testimony was also relevant to Cotton's indictment for distribution of cocaine and heroin on December 1, 1987. Detective Causey testified that on that date she observed Cotton sell a mixture of heroin and cocaine in balloons to "Bubby," an individual she set up to make the purchase for her. Cotton contended at trial that he was not the individual who sold the cocaine and heroin to "Bubby." Thus, his identity was in issue and Butler's testimony that Cotton said he originated the idea of selling cocaine and heroin as "Double Dutch" was relevant.

We must still consider, however, whether the relevance of Butler's testimony is outweighed by its prejudicial value under Rule 403. We have cautioned that "[i]f judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Scarfo*, 850 F.2d at 1019 (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978)).

The record indicates that the district court was fully aware of the prejudicial effect of Butler's testimony when it made its ruling. In fact, it excluded the testimony of co-defendant Roland Slade that he had purchased cocaine, as well as heroin, from Cotton. App. at 408. The government sought to use that evidence only to show Cotton's "intent" to distribute drugs in the past. *Id.* at 409, 412. The court found that the government did not make a sufficient showing to admit the evidence under Rule 404(b). *Id.* at 416. By contrast, it found the testimony of Butler regarding Cotton's "Double Dutch" sales much more probative. *Id.* at 421.

Moreover, any prejudice resulting from the admission of Butler's testimony was unlikely to "cause the jury to base its decision on something other than the established propositions in this case." *Carter v. Hewitt,* 617 F.2d 961, 972 (3d Cir.1980) (quotation omitted). Cotton was charged with and the jury heard other testimony concerning his distribution of cocaine and heroin. The evidence also implicated him in a conspiracy to distribute heroin. Unlike *Schwartz,* this case involves more than a single count of distribution and the government clearly articulated the purposes for which it intended to use the evidence. We therefore hold that the district court's admission of Butler's testimony was not an abuse of discretion.

### D. *Motions to Sever*

McGlory, Cotton and Kulkovit also attack the district court's denial of their motions for severance under Federal Rule of Criminal Procedure 14. That rule provides, in part, that:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separated trials of counts, grant a severance of defendants or provide whatever relief justice requires.

Fed.R.Crim.P. 14. In reviewing orders denying severance under Rule 14, this Court must first determine from the record, as it existed when the motion was made, what trial developments were then reasonably foreseeable, and in that light decide whether the district court abused its discretion in denying the severance motion. *United States v. Sandini*, 888 F.2d 300, 305–06 (3d Cir.1989), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990). We must also balance the public interest in joint trials against the possibility of prejudicial joinder. Principals of judicial economy often favor a joint trial when a conspiracy is charged. *See United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988).

■ Significantly, even if the district court abused its discretion in denying the severance motion, the defendant must pinpoint "clear and substantial prejudice" resulting in an unfair trial. *Eufrasio*, 935 F.2d at 568 (emphasis omitted) (citation omitted). It is not enough to show that severance would have increased the defendant's chances of acquittal. *United States v. Hayes*, 861 F.2d 1225, 1231–32 (10th Cir. 1988).

■ McGlory and Kulkovit contend that Butler's testimony that Cotton was buying cocaine from him related to an entirely separate conspiracy which affected them by implication. The introduction of evidence more damaging to one defendant than another does not entitle the seemingly less culpable defendant to a severance. *United States v. De Peri*, 778 F.2d 963, 983 (3d Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986). Fur-

ther, the mere introduction of other crimes evidence against one defendant does not entitle a co-defendant to a separate trial. *United States v. Rocha*, 916 F.2d 219, 228–29 (5th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). The inquiry is whether the jury can reasonably be expected to compartmentalize the evidence against each defendant. *Eufrasio*, 935 F.2d at 568 (quoting *De Peri*, 778 F.2d at 984).

The admission of Butler's testimony about Cotton's cocaine purchases could easily be segregated by the jury. The government never sought to link McGlory or Kulkovit with Cotton's cocaine dealings, but only to heroin. There was substantial evidence that McGlory and Kulkovit were involved in a conspiracy to distribute heroin. McGlory contends that references in Agent Rotter's testimony to McGlory's possession of cocaine at the time of his arrest and references in Cotton's closing argument to McGlory's cocaine dealings with Cotton heightened the prejudicial effect of Butler's testimony and could only have led the jury to believe McGlory was involved in large scale cocaine transactions. We disagree. The government made no attempt to prove McGlory used cocaine on a personal basis or got cocaine from Cotton. Instead, it produced substantial evidence that McGlory was trafficking in heroin. These isolated references to cocaine in this lengthy trial involving over 200 exhibits is hardly so prejudicial that it requires a severance.

■ Cotton also contends that the improper joinder of his case with McGlory's resulted in the denial of his Sixth Amendment right to confront witnesses against him because he was entitled to cross-examine McGlory as to the notes found in his trash and residences. Cotton has offered no evidence McGlory would in fact testify if Cotton had been separately tried. *See United States v. Dickens*, 695 F.2d 765, 779 (3d Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983). Cotton's reliance on *United States v. Reynolds*, 715 F.2d 99 (3d Cir.1983), is misplaced. There, we held that the district court erred in admitting the hearsay state-

ment of one co-defendant against another. We said the admission of the hearsay statement seriously prejudiced the defendant because his co-defendant could not be compelled to testify at their joint trial. *Id.* at 105. In this case, in contrast, all but three of the notes found in McGlory's trash and residences were properly admitted under Rule 801(d)(2)(E) and the improper admission of those three was harmless error. We fail to see any "clear and substantial prejudice" from Cotton's inability to cross-examine McGlory. *See Eufrasio,* 935 F.2d at 568 (emphasis and citation omitted).

In short, we agree with the district court that none of the three defendants have shown that denial of their Rule 14 motions to sever was so prejudicial that a new trial is warranted. Further, since Kulkovit, McGlory and Cotton were jointly indicted and all charged with the same conspiracy, the interest of judicial economy that is served by a joint trial outweighs any prejudice. *See Eufrasio,* 935 F.2d at 568.

### E. *Cotton's Motion to Suppress the Evidence Seized From his Vehicle*

Cotton was arrested by Detectives Robert Pires and Jack Smith of the Pittsburgh Police Department on September 15, 1988 at 9:30 p.m. They had then seen a blue Volkswagen approach the residence of Gregory Tempolski, a known drug dealer. Tempolski approached the driver's side of the vehicle and after a conversation entered the vehicle on the passenger's side. The detectives drove around the vehicle, observed that Cotton was the driver, and saw Tempolski hand money to Cotton. Detective Pires recognized Cotton from his participation in a surveillance team on December 1, 1987 when he observed Cotton sell drugs in a controlled buy set up by Detective Causey. Suspecting that they were observing a drug sale and believing that a warrant for Cotton's arrest had been issued based on the December 1, 1987 occasion, Pires decided to arrest Cotton. As it

turned out, no arrest warrant had yet been issued.[21]

The detectives circled the block and then parked near Cotton's vehicle. Pires approached the passenger's side of the vehicle and saw Tempolski trying to put something in his pants. He asked Tempolski to exit the vehicle and observed a plastic baggie sticking out of his pocket. Tempolski immediately said "nothing going on Bob, nothin going on." Appendix of Appellant Cotton (Cotton App.) at 65. Pires patted Tempolski down and removed the baggie from his pocket, suspecting it to contain heroin. He then placed Tempolski under arrest. A lab investigation later showed the bag did contain heroin.

Detective Smith removed Cotton from the driver's side of the vehicle and told him he was under arrest. Smith testified that he looked inside the vehicle, saw the top of a baggie containing white powder which was sitting between the front seats, and pointed it out to Pires. The detectives seized the bag. Lab investigation later revealed that the powder in this bag was also heroin. The detectives also seized a paper bag containing $4,020.00 cash from between the seats of the vehicle and an alligator bag containing $3,180.00 from the trunk. Cotton moved to suppress this evidence seized from his vehicle. At the suppression hearing and at trial, Pires testified that Cotton consented to the search of his vehicle.

The district court ruled that the testimony of Pires and Smith at the suppression hearing did not adequately support "the government's contentions that the bag of heroin seen by Officer Smith was in 'plain view,' nor that defendant Cotton gave his consent to search the vehicle, nor that the officers had observed sufficient activity to give them probable cause to believe a drug sale was taking place." *United States v. McGlory,* No. 89–144, slip op. at 3 (W.D.Pa. Apr. 25, 1990), *reprinted in* Cotton App. at 121. Although the court indicated that the officers had sufficient information to justi-

---

**21.** The warrant was not issued until September 16, 1988, the day after the search of Cotton's vehicle. Detective Causey testified that Cotton

was not arrested on December 1, 1987 so that she could continue her narcotics investigation in an undercover capacity.

fy further investigation based on their suspicions that a drug deal was taking place, it dropped this inquiry because it found that the search of the passenger area of the vehicle was proper as "incident to the arrest" of Cotton. *Id., reprinted in* Cotton App. at 121; *see id.* at 5, *reprinted in* Cotton App. at 123 (citing *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981)). It then held the bag of powder and the cash found in the passenger area gave the detectives probable cause to search the rest of the vehicle under the automobile exception to the warrant requirement. *See id.* at 5, *reprinted in* Cotton App. at 123 (citing *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982)); *see also California v. Acevedo,* —— U.S. ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991) (clarifying scope of automobile exception); *United States v. Schecter,* 717 F.2d 864, 867–71 (3d Cir.1983) (discussing exceptions to warrant requirement).

Cotton's basic argument is that Detective Pires did not have probable cause to arrest him. He objects to the district court's use of the search incident to arrest exception to the warrant requirement because Pires did not mention his belief about the outstanding warrant at Cotton's preliminary hearing. At the preliminary hearing, Pires said he searched the vehicle based on Cotton's consent. Pires did not mention his belief about the warrant until Cotton's suppression hearing and repeated it during the trial. Thus, Cotton argues Pires made up the story about his belief in the warrant and thus lacked any good faith belief he had probable cause to arrest Cotton in the first place.

■ The district court said that, regardless of the non-existent warrant, Pires had sufficient probable cause to arrest Cotton because Pires had personally observed Cotton's involvement in the prior narcotics transaction involving Detective Causey. The court stated:

> Our conclusion is not changed by the fact that Pires was arresting Cotton not because of his belief that probable cause existed, but because of his mistaken belief that a warrant existed.
>
> We believe that Officer Pires was acting under the good faith belief that an arrest warrant existed for [Cotton's] alleged sale of drugs on December 1, 1987, and that there was sufficient probable cause known to the officer to support an arrest on charges stemming from the December 1, 1987 alleged sale. We do not conclude that the arrest of Cotton was delayed from December, 1987, until September 15, 1988, simply to create a situation in which the officers could search Cotton's vehicle.

*Id.* at 4, *reprinted in* Cotton App. at 122. We review the district court's finding of probable cause under the clearly erroneous standard. If the district court's ruling is "plausible in light of the record viewed in its entirety," we must accept it, even if we would have evaluated the evidence differently in the first instance. *United States v. Kikumura,* 918 F.2d 1084, 1090 (3d Cir. 1990) (quotation omitted). We see no error here.

■ Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony. *See United States v. Watson,* 423 U.S. 411, 421, 96 S.Ct. 820, 827, 46 L.Ed.2d 598 (1976). Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense had been committed. *United States v. Cruz,* 910 F.2d 1072, 1076 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991). While the district court did not believe that the alleged exchange of money between Cotton and Tempolski would have been enough to support a finding of probable cause, it rested its finding on the fact that "Pires personally had observed Cotton while on surveillance duty at a previous controlled buy, and was aware of the events forming the basis of the complaint filed by Detective Causey." *McGlory,* slip op. at 4, *reprinted in* Cotton App. at 122. This finding is fully supported. Detective Causey testified about the events surround-

ing the December 1, 1987 drug sale by Cotton. Causey had told Pires and other officers to be on the lookout for Cotton and to "pick him up." *Id.* at 2, *reprinted in* Cotton App. at 120. Detective Sledge testified that he observed the sale with Pires from a vehicle they shared and that he and Pires identified Cotton at that time. Because probable cause existed to arrest Cotton, the evidence seized from his vehicle was properly admitted under the search incident to a lawful arrest exception to the warrant requirement.

Alternately, the search could be sustained on grounds the district court merely mentioned. It believed that the officers had sufficient information to justify further investigation. Detective Pires was familiar with Tempolski's "modus operandi" as a drug trafficker.[22] He observed Tempolski approach Cotton's vehicle, get in the vehicle, and hand Cotton money. These circumstances plainly gave rise to a reasonable suspicion sufficient for an investigative stop. *See Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968).[23] When asked to get out of the car Tempolski immediately replied that "nothing going on Bob, nothin going on," and Pires noticed a baggie sticking out of Tempolski's pocket. Detective Pires' pat down search of Tempolski recovered a small bag of heroin and a folded paper containing heroin. He then arrested Tempolski. Smith and Pires also observed a bag of powder in the front seat. These added circumstances converted the initial reasonable suspicion into probable cause to search the vehicle. The automobile exception to the warrant requirement permits "warrantless searches of any part of a vehicle that may conceal evidence ... where there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Salmon*, 944

F.2d 1106, 1123 (3d Cir.1991) (citing *Ross*, 456 U.S. at 825, 102 S.Ct. at 2173), *cert. denied,* —— U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *see Acevedo*, 111 S.Ct. at 1991. Thus, the evidence seized from Cotton's vehicle was also properly admitted under the automobile exception to the warrant requirement.

### F. *Hauser's and Kulkovit's Motions for a Mistrial*

During the government's case in chief, co-defendant Norma Pruitt testified that she had been charged in December of 1989 with conspiracy to distribute in excess of one kilogram of heroin, that she pleaded guilty to this charge, and that after her plea she had been issued a subpoena to testify. Pruitt testified that she and McGlory had had a close relationship for over twenty years. She also testified that she traveled with McGlory to Los Angeles about once a month for a year and brought back what they purchased in Los Angeles. App. at 819–25. At this point, Pruitt refused to testify any further, and she was held in contempt outside the presence of the jury. Kulkovit and Hauser moved for a mistrial claiming that their inability to cross-examine Pruitt violated their right to confrontation under the Sixth Amendment to the United States Constitution. The district court denied their motions and gave a curative instruction to the jury.

Under the Sixth Amendment's Confrontation Clause, a defendant has the right to cross-examine witnesses against him. *See* U.S. Const. amend. VI. The confrontation clause only "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in

---

**22.** The officers knew that Tempolski's method was to get in the passenger side of a prospective buyer or seller's vehicle, make the exchange and exit the vehicle.

**23.** The detectives may also have had a reasonable suspicion that Cotton was involved in or wanted for a felony involving Detective Causey that permitted them to stop him. In *United*

*States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985), the Supreme Court held that if police have reasonable suspicion grounded in articulable facts that a person they encounter was involved in or wanted in connection with a felony, a *Terry* stop may be made.

original). If a witness' invocation of her rights under the Fifth Amendment to the United States Constitution could interfere with a defendant's right to cross-examine, the district court must ensure that the invocation did not "effectively ... emasculate the right of cross-examination itself." *Id.* at 19, 106 S.Ct. at 294 (quotation omitted). Courts often prevent an emasculation of the confrontation right by striking the testimony of a nonrespondent witness. *See generally Bagby v. Kuhlman,* 932 F.2d 131, 135 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 341, 116 L.Ed.2d 281 (1991); *United States v. Zapata,* 871 F.2d 616, 623–24 (7th Cir.1989). Use of this remedy lies within the district court's discretion. *Zapata,* 871 F.2d at 624.

We have recognized that reversible error, on Sixth Amendment grounds, may occur where the witness' testimony "add[s] critical weight to the prosecution's case in a form not subject to cross-examination." *Todaro v. Fulcomer,* 944 F.2d 1079, 1084–85 (3d Cir.1991) (quoting *Douglas v. Alabama,* 380 U.S. 415, 420, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965) (further quotation omitted)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1271, 117 L.Ed.2d 498 (1992). Hauser relies on *United States v. Demchak,* 545 F.2d 1029 (5th Cir.1977), a case we think is distinguishable. There, a father who pled guilty to a drug conspiracy that involved his son testified at the son's trial. Before the district court precluded further testimony to protect his Fifth Amendment rights concerning other drug charges against him, the father testified about a specific drug transaction that implicated his son in the conspiracy. The district court then severely limited the son's cross-examination of his father. The son moved for a mistrial on Sixth Amendment grounds since he was denied the opportunity for effective cross-examination. *Id.* at 1030. The district court denied the motion but struck the father's testimony. Because of the damaging nature of the father's testimony, the Fifth Circuit reversed the district court's ruling. *Id.*

In this case, in contrast, Pruitt's testimony did not implicate anyone in criminal activity. She did not testify at all concerning Hauser. While she did testify that she took trips with McGlory to Los Angeles, she did *not* testify that she and McGlory visited Kulkovit in Los Angeles. Her testimony with respect to trips to Los Angeles did not unfairly prejudice Kulkovit. There were hotel records of McGlory's stays in Los Angeles showing phone calls to Kulkovit, records of purchases made by McGlory while there, wire transfers of money by McGlory to Kulkovit in Los Angeles as well as other substantial evidence connecting Kulkovit and McGlory. "Prejudicial testimony will not mandate a mistrial when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury." *United States v. Rodriguez–Arevalo,* 734 F.2d 612, 615 (11th Cir.1984). Further, the district court struck Pruitt's testimony and gave a curative instruction.

The fact that Pruitt testified that she entered a plea to a conspiracy is not so prejudicial that the jury would not be able to follow the judge's curative instruction. *Cf. United States v. Gambino,* 926 F.2d 1355, 1364 (3d Cir.1991) (court's instruction to jury on day after co-defendant entered guilty plea in ongoing trial not to infer anything from his absence was adequate to prevent jurors from inferring guilt of other co-defendants), *cert. denied,* —— U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). Finally, Hauser's attempt to rely on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) is unavailing. This case simply does not involve the admission of a co-defendant's confession that implicates him. Even if the district court had not stricken Pruitt's testimony from the record, it is "highly probable" that evidence of Pruitt's guilty plea would not have contributed to the jury's verdict. *See United States v. Werme,* 939 F.2d 108, 116 (3d Cir.1991) ("highly probable" that admission of coconspirators' guilty pleas did not contribute to jury's verdict), *cert. denied,* —— U.S. ——, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1991). We will affirm the district court's order denying Hauser's and Kulkovit's motions for a mistrial.

### G. *Kulkovit's Challenge to the Government's Affidavit in Support of Orders Authorizing Electronic Surveillance*

Pursuant to 18 U.S.C.A. § 2518(1)(c) (West 1970 & Supp.1991), the affidavit in support of a request for an order authorizing wire interceptions must contain:

a full and complete statement as to whether or not investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C.A. § 2518(1)(c). Before entering the order authorizing the wiretap, the authorizing judge must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.A. § 2518(3)(c) (West 1970 & Supp.1991). Our review is plenary. *United States v. Adams,* 759 F.2d 1099, 1114 (3d Cir.), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985); *see United States v. Traitz,* 871 F.2d 368, 377 (3d Cir.) (court reviews affidavit on appeal), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989).

The government need only lay a "factual predicate" sufficient to inform the judge why other methods of investigation are not sufficient. *See United States v. Armocida,* 515 F.2d 29, 38 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). The government's showing is to be "tested in a practical and commonsense fashion." *United States v. Vento,* 533 F.2d 838, 849 (3d Cir.1976) (quotation omitted). The government's affidavit in this case was sufficient to show that there was no way to produce sufficient evidence of the narcotics transactions between Kulkovit and McGlory without knowledge of the contents of the calls between them. *See* Govt.App. at 71, 135–38.

### H. *Kulkovit's Challenge to the Admission of Expert Testimony*

Kulkovit challenges the district court's admission of expert opinion testimony by DEA Agent Lloyd and the government's handwriting expert. We review the district court's admission of expert testimony for abuse of discretion. *See United States v. Theodoropoulos,* 866 F.2d 587, 590 (3d Cir. 1989).

Agent Lloyd testified from special knowledge about heroin trafficking in Thailand, the smuggling of heroin into the United States from Thailand, and the amount of heroin coming from Thailand and entering this country in Los Angeles. Lloyd also testified factually that Kulkovit's passport showed several trips to Thailand. Kulkovit contends that the district court abused its discretion in admitting Lloyd's testimony because it tended to prove guilt by association on the basis of Kulkovit's Thai nationality. We reject this argument. The only requirement for admitting expert testimony pursuant to Federal Rule of Evidence 702 is that it must be helpful to the jury's understanding of some fact at issue. *See* Fed.R.Evid. 702; *Theodoropoulos,* 866 F.2d at 591–92. In cases involving narcotics trafficking, courts have admitted a broad range of expert testimony concerning the "modus operandi" of the drug trade. *See, e.g., United States v. Khan,* 787 F.2d 28, 34 (2d Cir.1986) (expert testimony about heroin trafficking in Pakistan properly admitted); *United States v. Wright–Barker,* 784 F.2d 161, 169–70 (3d Cir.1986) (use of expert testimony about narcotics smuggling); *cf. United States v. Pungitore,* 910 F.2d 1084, 1148 (3d Cir. 1990) (expert testimony as to structure of organized crime families helpful to jury), *cert. denied,* —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). In this case, the evidence was relevant and not unduly prejudicial. The district court did not abuse its discretion in deciding that Lloyd's testimony was helpful to the jury.

We likewise reject Kulkovit's challenge to the district court's admission of the testimony of William Riordan, the government's handwriting expert. At trial, the government introduced receipts showing that McGlory was sending money to Kulkovit via Western Union on a regular basis. The handwriting expert testified that there were numerous similarities between the signatures of a V. Kulkovit on

the receipts and a handwriting exemplar of Kulkovit's. This expert was fully able to identify only one of the signatures as Kulkovit's.

 Kulkovit contends that the district court abused its discretion in admitting the testimony of the expert because the expert could not make a positive statement that the handwriting on all of the receipts was his.[24] Under Federal Rule of Evidence 702, the expert testimony need only be helpful to the jury. Expert testimony as to the similarities in handwriting is generally admissible. *See United States v. Cairns,* 434 F.2d 643, 644 n. 3 (9th Cir.1970). This is so even if the handwriting expert is not absolutely certain that the handwriting is that of the defendant. *See United States v. Herrera,* 832 F.2d 833, 837 (4th Cir.1987); *United States v. Fleishman,* 684 F.2d 1329, 1336–37 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). Any issue regarding the certainty of Riordan's testimony goes to the weight given that testimony and could be tested by cross-examination. The district court did not abuse its discretion in admitting the testimony.

## I. *Sentencing Challenges by McGlory and Kulkovit*

Count One of the indictment charged McGlory with conspiring to possess with intent to distribute and to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C.A. § 846.[25] Pursuant to 21 U.S.C.A. § 851(a)(1) (West 1981), the government notified McGlory that because he had previously been convicted of drug-related felony offenses on two occasions, he was subject to mandatory life imprisonment if convicted on Count One.[26] Under 21 U.S.C.A. § 841(b)(1)(A)(i) (West Supp. 1991) and 21 U.S.C.A. § 846, a mandatory life sentence is imposed if a defendant conspires to possess with intent to distribute more than one kilogram of heroin after two or more prior convictions for a felony drug offense.

The jury convicted McGlory of conspiring to possess more than one kilogram of heroin. The district court found that McGlory had been convicted of two prior drug-related felonies. Accordingly, the district court imposed a mandatory life sentence. Alternately, for the purpose of determining McGlory's sentence under the Sentencing Guidelines, the district court found that the conspiracy involved at least 15.5 kilograms of heroin. Kulkovit's sentence was also based on this amount of heroin. Kulkovit was sentenced to 360 months on the heroin conspiracy count and 240 months on each money laundering count. He objects only to his sentence on the conspiracy count.

---

**24.** Kulkovit also challenges the authenticity of the receipts bearing his signature. Kulkovit failed to object to the admission of this evidence on authenticity grounds at trial. Therefore, we review its admission for plain error. *See United States v. Leo,* 941 F.2d 181, 193 (3d Cir.1991). "[P]lain error occurs only when there is 'egregious error or a manifest miscarriage of justice.'" *United States v. Tsai,* 954 F.2d 155, 161 (3d Cir.1992) (quoting *United States v. Thame,* 846 F.2d 200, 204 (3d Cir.1988)). As discussed above, the handwriting expert testified to "numerous similarities" between the signature on these receipts and Kulkovit's handwriting exemplar. In addition, a Western Union employee identified Kulkovit at trial as the person picking up the wired money and said that he remembered Kulkovit because he was a big tipper. We see no plain error in the decision this evidence was properly authenticated.

**25.** 21 U.S.C.A. § 846 provides:
Any person who attempts to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of

which was the object of the attempt or conspiracy.
The "offense defined in this subchapter," *id.,* that McGlory was charged with violating was 21 U.S.C.A. § 841(a)(1) which reads:
(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]

**26.** That subsection provides:
No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.
21 U.S.C.A. § 851(a)(1).

### 1. Challenge to the Guidelines Calculation

McGlory and Kulkovit challenge their sentence as computed under the Sentencing Guidelines for 15.5 kilograms of heroin contending that the district court improperly relied on a pretrial statement of Norma Pruitt that the conspiracy involved that amount. Pruitt gave a statement prior to her arrest that she, working with McGlory, brought between 2 to 4 pounds of heroin per month back from Los Angeles during the period of April 1986 through September 1987. Appendix for Appellant Kulkovit (Kulkovit App.) at 128–36.

As to McGlory, the 15.5 kilogram amount and Pruitt's statement were relevant only to determine what Guidelines sentence was appropriate for him and not to determine whether he was subject to a mandatory life term under 21 U.S.C.A. § 841(b)(1)(A)(i). Imposition of the mandatory life term required only that McGlory conspire to possess in excess of *one* kilogram of heroin and have two prior felony drug offenses. *See* 21 U.S.C.A. § 841(b)(1)(A)(i). Pursuant to section 5G1.1 of the Guidelines, "[w]here a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(b); *see United States v. Donley*, 878 F.2d 735, 741 (3d Cir.1989). For purposes of his mandatory life sentence, the jury found beyond a reasonable doubt that McGlory conspired to possess in excess of one kilogram of heroin. Pruitt's statement was not admitted into evidence at trial, nor did the jury rely on her statement in any way. Thus, McGlory cannot object to his mandatory life sentence on the basis of Pruitt's statement.

▮▮▮▮▮ It is true that Kulkovit had no opportunity to cross-examine Pruitt concerning her statement, but this Court held in *United States v. Kikumura*, 918 F.2d 1084, 1099–1100 (3d Cir.1990), that the Sixth Amendment's confrontation clause does not apply to sentencing hearings and reliable hearsay is generally admissible.[27] *See also United States v. Sciarrino*, 884 F.2d 95, 97 (3d Cir.) (reliance on reliable hearsay in guideline sentencing appropriate), *cert. denied*, 493 U.S. 997, 110 S.Ct. 553, 107 L.Ed.2d 549 (1989). Consistent with due process, factual matters may be considered at sentencing "if they have some minimal indicium of reliability beyond mere allegation." *United States v. Baylin*, 696 F.2d 1030, 1040 (3d Cir.1982); *see also* U.S.S.G. § 6A1.3 (Sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). The district court found that Pruitt's statement was reliable and corroborated by specific evidence at trial. Kulkovit App. at 136. We must "accept the findings of fact of the district court unless they are clearly erroneous." *Kikumura*, 918 F.2d at 1098 (quotation omitted); *see United States v. Inigo*, 925 F.2d 641, 658 (3d Cir.1991).

The credibility of Pruitt's statement was for the district court to determine. *See United States v. Frondle*, 918 F.2d 62, 64–65 (8th Cir.) (rejecting challenge to district court's finding that testimony of informant as to amount of drugs involved in conspiracy was reliable), *cert. denied*, — U.S. —, 111 S.Ct. 1400, 113 L.Ed.2d 455 (1991). We do not think the district court's finding as to the amount of heroin involved in this case is clearly erroneous.

▮▮▮ Further, since Kulkovit's sentence was within the Guideline range, the government was only required to establish the amount of narcotics involved in the conspiracy by a preponderance of the evidence. *See McMillan v. Pennsylvania*, 477 U.S. 79, 91, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986) (preponderance standard is gener-

27. *Kikumura* requires hearsay declarations to be not only reliable but "reasonably trustworthy" when used to support a "dramatic" upward departure from the Guidelines. *Kikumura*, 918 F.2d at 1103. There is no upward departure in this case.

ally constitutional at sentencing).[28] The preponderance test was plainly met. Accordingly, we will affirm Kulkovit's sentence at Count One.

### 2. McGlory's Challenge to the Status of His Two Prior Felony Convictions

McGlory was convicted in Pennsylvania of possession of cocaine on June 16, 1970 and sentenced to six to twelve months on that charge on December 21, 1971. He was also convicted in Pennsylvania on March 20, 1972 of dealing in heroin and sentenced to two to five years for that crime on December 6, 1972. He was convicted of possession of cocaine on March 22, 1972 and sentenced to one to two years on December 6, 1972, to be served consecutively to the two to five year sentence for heroin dealing. He was paroled from his December 1972 sentences on March 20, 1974.

McGlory's convictions for possession of cocaine in 1971 and for possession of cocaine and heroin in 1972 were felonies under Pennsylvania's now repealed Drug, Device and Cosmetic Act of 1961. *See* Drug, Device and Cosmetic Act of September 26, 1961, Pub.L. No. 1664, §§ 1 *et seq.*, 1961 Pa.Laws 1664, *repealed by* Controlled Substance, Drug, Device and Cosmetic Act of April 14, 1972, Pub.L. No. 233, No. 64, §§ 1 *et seq.* (codified as amended at Pa.Stat.Ann. tit. 35, §§ 780–101 *et seq.* (1977 & Supp. 1991)). The relevant provision of that Act stated:

> Any person who possesses any narcotic drugs in violation of the provisions of this Act shall be guilty of a felony ... and ... undergo imprisonment of not less than two (2) years and not exceeding five (5) years.

Pa.Stat.Ann. tit. 35, § 780–20(c) (1961) (repealed). Cocaine and heroin were both classified as narcotic drugs under the statute. *See id.* § 780–2(g) (1961) (repealed).

Under the mandatory life sentence provision of 21 U.S.C.A. § 841(b)(1)(A), a prior felony drug offense is defined as any drug offense "that is a felony ... under any law of a State ... that prohibits or restricts conduct relating to narcotic drugs." [29] Effective June 14, 1972, the state statute serving as the basis for McGlory's three state convictions was repealed by the Controlled Substance, Drug, Device and Cosmetic Act of 1972 ("Controlled Substance Act"). *See* Controlled Substance, Drug, Device and Cosmetic Act of April 14, 1972, Pub.L. No. 233, No. 64, § 1 (codified as amended at Pa.Stat.Ann. tit. 35, §§ 780–101 *et seq.* (1977 & Supp.1991)). The new statute reduced the penalty for possession of cocaine to a misdemeanor offense. *See* Pa.Stat.Ann. tit. 35, § 780–113(a)(16) & (b) (1977). Felony convictions which were not "final" on the effective date of the act were to be resentenced as misdemeanor offenses. *See id.* § 780–139(a) (1977). The definition of "final" in the Controlled Substances Act was considered in *United States v. Tobin,* 408 F.Supp. 760, 762–63 (W.D.Pa.), *aff'd mem.,* 546 F.2d 420 (3d Cir.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2928, 53 L.Ed.2d 1065 (1977).[30] The court stated the following rule:

> [A] judgment is not final until the availability of appeal has been exhausted and the time for petition for certiorari has lapsed.

*Id.* at 763.

McGlory's conviction for simple possession of cocaine in December 1971 was final prior to the effective date of the Controlled Substances Act. Accordingly, the district court considered it a prior felony under 21 U.S.C.A. § 841(a)(1)(A)(i). *See* App. at 2483–84. The district court held that

---

**28.** *Kikumura* also suggested that the facts underlying a substantial departure from the Guidelines must be established by "clear and convincing" evidence. *See id.* at 1101. Again, we note there is no such departure in this case.

**29.** Prior to its amendment in November 1988, the statute only counted prior felony drug offenses under federal law. *Compare* 21 U.S.C.A. § 841(b)(1)(A) (West 1981) *with* 21 U.S.C.A. § 841(b)(1)(A) (West 1991).

**30.** Prior to *Tobin,* the Supreme Court of Pennsylvania had twice applied the Controlled Substances Act's definition of finality. *See Commonwealth v. Goodman,* 454 Pa. 358, 311 A.2d 652, 655 (1973); *Commonwealth v. Thomas,* 450 Pa. 548, 301 A.2d 359, 364 (1973).

McGlory's conviction for possession of cocaine in December 1972 was *not* final as of the effective date of the amendment because his appeal of that conviction was not final until December 1973. *See Commonwealth v. McGlory*, 226 Pa.Super. 493, 313 A.2d 326 (1973). Thus, the district court did not treat that conviction as a prior felony for purposes of 21 U.S.C.A. § 841(a)(1)(A)(i). *See* App. at 2485. McGlory's conviction for heroin possession in December 1972 was not affected by the repeal of the Drug, Device and Cosmetic Act because it remained a felony under the Controlled Substances Act. *See* Pa.Stat.Ann. tit. 35, § 780–113(f)(1); *id.* § 104(1)(ii). The 1971 cocaine conviction and the 1972 heroin conviction thus satisfied the requirement of two prior felony drug offenses.

■ McGlory contends that his 1971 conviction for possession of cocaine cannot be considered a felony for purposes of 21 U.S.C.A. § 841(b)(1)(A)(i) because if he were convicted of the same conduct today, that conduct would only amount to a misdemeanor conviction under Pennsylvania law. This argument presents an issue of first impression. McGlory also says that 21 U.S.C.A. § 841(b)(1)(A)(i) does not clearly state whether the term "prior felony offense" in the statute refers to felony status under state law in effect in November 1988 when 21 U.S.C.A. § 841(b)(1)(A) was amended to include prior felony convictions under state law, or prior thereto. With no legislative history available, McGlory looks to the Guidelines for analogy. He contends that the analogous Guideline pertaining to career offenders looks to the *conduct* rather than the classification given by the law to prior offenses. U.S.S.G. § 4B1.1 provides greater offense levels for career offenders. It states, in relevant part:

A defendant is a career offender if (1) the defendant was at least eighteen

years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1.

Section 4B1.2(3) defines the term "two prior felony convictions" employed in U.S.S.G. § 4B1.1.[31] Application Note 3 to U.S.S.G. § 4B1.2 states the following:

"Prior felony conviction" means a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed.

U.S.S.G. § 4B1.2 application note 3. Thus, a state crime classified as a misdemeanor, which in fact has a penalty in excess of one year for federal purposes, is construed as a felony under the career offender enhancement of the Guidelines. McGlory says that because the conduct involved in his 1971 conviction for possession of cocaine would now carry a sentence of less than a year, it would be classified as a misdemeanor under U.S.S.G. § 4B1.2.

We are not persuaded. First, despite McGlory's reference to the Guidelines, "our starting point [in cases of statutory construction] must be the language employed by Congress." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (quotation omitted). The text of 21 U.S.C.A. § 841(b)(1)(A) provides for a mandatory life sentence "after two or more prior convictions for a felony drug offense have become final." Prior convictions are final when they are no longer subject to examination on direct

---

**31.** Section 4B1.2 reads:
The term "two prior felony convictions" means (A) the defendant committed the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense (*i.e.,* two felony convictions of a crime of violence, two felony convictions of a controlled substance offense, or one felony con-

viction of a crime of violence and one felony conviction of a controlled substance offense), and (B) the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of § 4A1.1(a), (b), or (c). The date that a defendant sustained a conviction shall be the date the judgment of conviction was entered.
· U.S.S.G. § 4B1.2(3).

appeal. *See United States v. Allen,* 566 F.2d 1193, 1195 (3d Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). As discussed above, McGlory's two prior convictions are final. A prior conviction for a felony drug offense is defined in 21 U.S.C.A. § 841(b)(1)(A) as any drug offense "that is a felony ... under any law of a State." *Id.* McGlory's contention that the status of his offense under state law should be determined as of November 1988, and not at the time of his conviction, requires us to read the statute's definition of a felony as if the following bracketed phrase were added: " '[F]elony drug offense' means an offense that is ... a felony under any law of a state"[, but if that law has been repealed or amended as of the date of·enactment of this subsection and the new law no longer characterizes the offense the defendant was convicted of as a felony, that offense shall not be counted as a felony drug offense under this subsection]. If Congress had intended to deal with this problem of conflict of laws in time in the manner McGlory suggests, it could have easily done so. The text of the statute does not so indicate.

To the extent that the text of section 841(b)(1)(A) has the seeds of ambiguity,[32] there are other reasons for rejecting McGlory's construction. Although the Guidelines do look at the punishment applicable to an offense instead of the state's classification of the offense as a felony, U.S.S.G. § 4B1.2 does not indicate that a sentencing court should look at the penal term applicable to McGlory's offense in 1987 when the Sentencing Guidelines were enacted, instead of at the time·he was convicted. In defining "two prior felony convictions," U.S.S.G. § 4B1.2(3) states: "The date that a defendant sustained a conviction shall be the date the judgment of conviction was entered." U.S.S.G. § 4B1.2(3).

Moreover, 21 U.S.C.A. § 841(b)(1)(A), which imposes a mandatory life sentence for conspiracy to distribute heroin coupled with two prior felony drug offenses, is entirely separate from the Guidelines. The Guidelines provide that if a statutory minimum is *greater* than the maximum of the applicable guideline range, "the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1. The legislation that included 21 U.S.C.A. § 841(b)(1)(A) was enacted to reach "major" drug dealers. *See United States v. Martinez–Zayas,* 857 F.2d 122, 129–30 (3d Cir.1988). McGlory fits that category.

■ Finally, we note the confusion in sentencing likely to result if the sentencing court had to analyze the status of every prior state conviction in terms of the status of state law in November 1988 when 21 U.S.C.A. § 841(b)(1)(A) was amended. This would entail applying changes in state law retroactively to final convictions. Generally, however, when a legislature repeals a statute, the repeal is not applied retroactively to final judgments. *See Davis v. Omitowoji,* 883 F.2d 1155, 1170 (3d Cir. 1989) ("the first rule of construction is that legislation must be considered as addressed to the future, not the past") (quotations omitted); *cf. United States v. Chambers,* 291 U.S. 217, 226, 54 S.Ct. 434, 436, 78 L.Ed. 763 (1934) (repealed penal·statute cannot be applied in pending prosecutions or proceedings on appeal). *See generally Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 1579–88, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) (summary of Court's jurisprudence on retroactivity). While the Supreme Court has adopted special rules for determining the retroactivity of judicial decisions announcing new constitutional rules of criminal procedure, *see Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 1075–77, 103 L.Ed.2d 334 (1989) (plurality); *Griffith v. Kentucky,* 479 U.S. 314, 320–28, 107 S.Ct. 708, 711–16, 93 L.Ed.2d 649 (1987), and for determining when a statute applied retroactively increases the punishment for criminal acts in violation of the *Ex Post Facto*

---

**32.** One possible textual indication in favor of McGlory's construction is the statute's use of the present tense in defining "felony drug offense." McGlory does not specifically mention this in his brief, but it is the use of·the present tense that makes his argument on ambiguity plausible.

Clause of the United States Constitution, *see Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 2718–24, 111 L.Ed.2d 30 (1990), those rules do not apply to the Pennsylvania legislature's decision in enacting the Controlled Substances Act to lessen the penalty for cocaine possession.

In enacting the Controlled Substances Act, the Pennsylvania legislature defined and limited the statute's retroactive effect. In *Tobin,* 408 F.Supp. 760, the defendant was convicted of marijuana possession in 1971, a felony under Pennsylvania's Drug, Device and Cosmetic Act at the time. The defendant contended that the provision of Pennsylvania's Controlled Substances Act of 1972 which reduced the crime of simple possession of marijuana from a felony to a misdemeanor made him eligible to purchase firearms under 18 U.S.C.A. §§ 922(a)(6) and 924(a). These statutes prohibit the purchase and possession of firearms by convicted felons. *Id.* at 761. The district court rejected this argument. It noted that the Controlled Substance Act specifically defined its relation to its predecessor law as follows:

> Prosecution for any violation of law occurring prior to the effective date of this act is *not* affected or abated by this act. In any case not yet final if the offense is similar to one set out in this act, the penalties under this act apply if they are less than those under prior law.

408 F.Supp. at 762 (emphasis added) (quoting Pa.Stat.Ann. tit. 35, § 780–139(a)). Thus, it held "the Pennsylvania General Assembly did not intend to make a wholesale reduction of prior marijuana offenses from felony to misdemeanor status." *Id.*[33]

Since the defendant's marijuana conviction was final at the time the Controlled Substances Act was enacted, he was not entitled to benefit from the reduced sentencing provisions of the Act and was therefore a convicted felon for purposes of the firearms statute. *Id.* at 763. The court's reasoning in *Tobin* is persuasive to us.

McGlory's argument is thus not only without support under federal law but is also contrary to the Pennsylvania law upon which his prior convictions rest. McGlory's prior convictions were final convictions for a felony under Pennsylvania law. Accordingly, we reject his challenge to the use of his 1972 cocaine conviction as a prior felony for purposes of 21 U.S.C.A. § 841(b)(1)(A).

## VI.

## CONCLUSION

For all of the foregoing reasons, the district court's orders of sentence and conviction will be affirmed.

BECKER, Circuit Judge, concurring.

I concur in the judgment and join in the majority opinion except for its discussion of the sufficiency of the evidence against Hauser and Cotton on the conspiracy charge and its discussion of imposition of a mandatory life sentence on McGlory. Unlike the majority, I would not place reliance in assessing the sufficiency of the evidence to support Hauser and Cotton's convictions on allegedly "coded" conversations between Cotton and McGlory and between Hauser and McGlory. Absent the testimony of an expert, who might have decoded

---

**33.** In fact, the Pennsylvania General Assembly did enact a savings provision in the Controlled Substances Act which could have provided the result McGlory desires. Pa.Stat.Ann. tit. 35, § 780–138 stated:

> [I]n any case final on or before June 12, 1972 in which a defendant was sentenced for the commission of acts similar to those proscribed by subsection (16) ... of section 13(a) of this act [cocaine possession], such defendant shall be resentenced under this act upon his petition if the penalties hereunder are less than those under prior law....

Pa.Stat.Ann. tit. 35, § 780–138 (West 1977). This savings provision, however, was held un-

constitutional by the Supreme Court of Pennsylvania in *Commonwealth v. Sutley,* 474 Pa. 256, 378 A.2d 780 (1977). The court held that the provision violated the doctrine of the separation of governmental powers because it impaired the finality of judgments of the judicial branch. *Id.* 378 A.2d at 784. It stated:

> [E]ven though the legislature possesses the power to promulgate the substantive law, judicial judgments and decrees entered pursuant to those laws may not be affected by subsequent legislative changes after those judgments and decrees have become final.

*Id.* (footnote omitted).

the cryptic conversations between these putative coconspirators and provided a link between the conversations and the conspiracy, I do not believe that such evidence counts in the calculus of determining guilt beyond a reasonable doubt. Because I believe that there was sufficient additional evidence to convict both defendants on the conspiracy count, however, I concur rather than dissent.

Further, while I agree with the majority's affirmance of the imposition of a mandatory life sentence on McGlory under 21 U.S.C. § 841(b)(1)(A), I also explain my reasons for concurring in the majority's judgment on that issue because it is so important, and because I find it necessary to consider a number of additional factors in interpreting the statute.

## I. SUFFICIENCY OF THE EVIDENCE AGAINST HAUSER

In discussing the sufficiency of the evidence against Hauser, the majority opinion makes much of five conversations between Hauser and McGlory which took place in 1988 and 1989 and which involved the use of slang and the recitation of various numbers. The majority concludes that all of these could reasonably be understood as code for drug transactions. These conversations included references to "slippers" and the recitation of various numbers, including "44," "19–29–75," and "627, 75, 1000, and 302."

The majority relies in this regard on *United States v. Theodoropoulos*, 866 F.2d 587 (3d Cir.1989). In *Theodoropoulos*, we sustained a conviction based on extensive testimony about coded communications regarding "televisions" between coconspirators which concealed a conspiracy to distribute drugs. Id. at 591–92. *Theodoropoulos* is easily distinguishable from this

case, however, because the jury there heard the testimony of an expert who had decoded the conversations and linked them to a drug conspiracy. Id. at 590–92.

Here, however, the jury heard no such expert testimony. In presenting its case, the government merely emphasized snippets of conversations from its surveillance of McGlory and Hauser, which could possibly constitute code. But no expert ever linked that code to the sale of drugs despite the government's extensive surveillance of these defendants and the government's sophistication in cryptanalysis. Compare, for example, *United States v. Rollins*, 862 F.2d 1282, 1293 (7th Cir.1988) (government expert decoding use of "t-shirts" in conversations between co-conspirators as a reference to drugs). Nor does the majority present any analysis, except for a conclusory assertion, which would explain the link between these particular numbers and heroin or between "slippers" and heroin. To my mind, there is no supportable link between any of these words and the distribution of heroin.[1]

Further, I believe that reliance on such evidence to sustain a conviction represents a dangerous precedent. As I have suggested, these words and numbers are merely pieces of larger conversations. Given that the defendants were charged with conspiracy to distribute heroin, these words and numbers no doubt tended to look very suspicious in the eyes of the jury, as they now do when the government urges them as the basis for affirming the conviction on appeal. We have, however, previously noted the dangers of relying on such evidence to sustain convictions:

> There is some tendency in conspiracy cases for finders-of-fact to believe that a defendant must have been involved in the

---

1. Indeed, our holding in *Theodoropoulos* demonstrates the difficulty with the majority's approach in this case. In *Theodoropoulos*, we upheld the admission of expert testimony to decode communications between defendants "because the code words [were] interwoven throughout the conversation, often in confusing contexts...." Id. at 592. Accord *United States v. Rollins*, 862 F.2d 1282, 1292 (7th Cir.1988) ("In our view, the district court properly con-

cluded that the meaning of narcotics code words and phrases is not within the common understanding of most jurors."). By finding expert testimony "helpful" in decoding narcotics code words under FRE 702, we conceded that lay jurors often have difficulty discerning the meaning of drug slang and code. If that is true, I find it problematic to base a conviction, even in part, on code and slang as cryptic as the kind involved in this case.

conspiracy, once evidence has been presented of some questionable acts the prosecution contends are but an extension of the larger conspiracy. Under our system of law, however, guilt must remain personal and individual, and a conviction, especially on charges relating to a conspiracy, must rest on individual guilt proven beyond a reasonable doubt. *United States v. Samuels*, 741 F.2d 570, 574–75 (3d Cir.1984) (citation omitted).

For these reasons, I would not convert Hauser's suspicious statements into a basis for guilt. Instead, I would uphold the conviction based upon the other evidence detailed by the majority. Most notably, the jury was free to infer that the various references to "Mel" on the "owe sheets" concerned Hauser, and that would implicate him in the ongoing conspiracy to distribute heroin. Further, Hauser sold heroin shortly after visiting McGlory, who was undoubtedly a heroin distributor. Because I am therefore satisfied that the jury was entitled to conclude that Hauser was involved in the conspiracy, I join in the judgment of the court affirming Hauser's conviction on the conspiracy count.

## II. SUFFICIENCY OF THE EVIDENCE AGAINST COTTON

I believe that the majority's reliance on equally cryptic conversations to sustain the conspiracy conviction of Cotton is also misplaced. The conversations between Cotton and McGlory contain references to a "restaurant" and "pizzas." The majority concludes that a jury could reasonably infer from those references that Cotton and McGlory were co-conspirators plotting the distribution of heroin. The majority finds this inference permissible despite the lack of evidence suggesting that "pizzas" and "restaurants" referred to heroin either in street slang or in some code devised by McGlory and Cotton.

Under these circumstances, I find reliance on such evidence to sustain the conspiracy conviction troubling. I suppose it is possible that "pizzas" and "restaurants" are references to drugs, but I know of no such usage. Further, in the absence of expert testimony decoding the communications between McGlory and Cotton, I am unwilling to say that it is "reasonable" to infer that they were discussing drugs.[2]

As with Hauser, I do not dispute that there was sufficient evidence to convict Cotton of conspiracy. The majority demonstrates that McGlory and Cotton's suspicious meetings could give rise to an inference that they were involved in drug activity. Cotton sold heroin shortly after his meetings with McGlory. Further, Cotton told one of his buyers that his source was being investigated at precisely the time that McGlory was being investigated. Also, a jury might have inferred that Cotton's name, like Hauser's name, appeared on the drug "owe sheets." I therefore conclude that the evidence is sufficient for the jury to conclude that Cotton was involved in the drug conspiracy. My disagreement with the majority is solely limited to its reliance on evidence which cannot be the basis for a reasonable inference of guilt.

## III. McGLORY'S MANDATORY LIFE SENTENCE

I believe that the majority ultimately reaches the correct result in construing 21 U.S.C. § 841(b)(1)(A) with regard to McGlory's sentence. However, I believe the question is much closer than the majority opinion allows, and that it therefore warrants more attention, particularly because McGlory will serve a life sentence based on our construction of the statute.

I note at the outset the intuitive appeal of McGlory's argument. The statute requires that a defendant, to be sentenced to life imprisonment, must have committed

---

**2.** In contrast, as the majority points out, there was testimony, given by a witness who was knowledgeable about the code used by these individuals, which identified "eating" as code for drug use and sales. I do not object to the majority's reliance on that evidence because, from all of the evidence, the jury could reasonably have relied on that term in its determination of guilt.

two prior drug felonies. McGlory's sentence, however, was increased to mandatory life imprisonment based in substantial part on his conviction for conduct that is no longer a felony under Pennsylvania law. Congress, in enacting the mandatory life sentence of section 841 as part of the Anti–Drug Abuse Act of 1988, no doubt wanted to impose the severe penalty of life imprisonment on individuals who repeatedly violated those state and federal laws proscribing the most dangerous and serious forms of drug involvement, and hence limited the penalty to those who previously had committed drug felonies. It therefore appears anomalous, if not harsh, to sentence McGlory to life imprisonment based on conduct that the Pennsylvania General Assembly no longer considers a serious drug offense.

The statute defines a prior felony drug offense as an offense "that ... *is* a felony under any law of a state." See 21 U.S.C. § 841(b)(1)(A) (emphasis added). I believe that this definition is hopelessly ambiguous. As I read it, it has three possible meanings. First, as the majority opinion concludes, it may refer to all offenses that were felonies at the time they were committed. Second, as McGlory argues, the definition arguably could refer to those offenses that were felonies at the time of the 1988 amendment to section 841. The statute defines felonies in the present tense, and under this reading, prior convictions for felonies that had been reclassified as misdemeanors by November 1988 could not be considered prior felony convictions for

purposes of the statute.[3] On the other hand, a conviction for a misdemeanor that was subsequently reclassified as a felony before November 1988 could count as a prior felony conviction.[4] A third plausible reading of the statute would require that those convictions for conduct considered a felony at the time a defendant violated section 841 would be treated as prior felony convictions. Because the definition reads in the present tense, the statute could reasonably be read as defining prior felony convictions in the present: what matters is arguably not how an offense was classified when the prior crime was committed, but rather how that conduct is classified when the defendant subsequently violates section 841.

Because all three of these possibilities appear plausible to me under a "plain" reading of the statute, I cannot agree with the majority to the extent that its decision relies on the text of the statute.[5] Therefore, I turn first to the relevant legislative history to attempt to discern congressional intent in this regard. As the majority points out, the history is unhelpful on this specific question. If Congress considered the problem of reclassification of offenses from misdemeanors to felonies and vice versa, it did not address it either in the text of the statute or in the abbreviated legislative history. See 135 Cong Rec S17,360–61 (daily ed November 10, 1988) (section analysis of the Anti–Drug Abuse Act of 1988). Because Congress may not even have con-

---

**3.** Such reclassification is not unusual or unlikely with respect to drug offenses. The offense at issue in McGlory's case, mere possession of cocaine, was subsequently determined to be a non-serious offense and hence downgraded to a misdemeanor. Conversely, possession of certain controlled substances (for example, crack cocaine, see note 7), has sometimes been upgraded from a misdemeanor to a felony. Moreover, there has been a trend towards classifying offenses based upon the amount of drugs involved so that, where the amount required to classify an offense as a felony has been lessened, an offense might be a felony where it had previously only been a misdemeanor.

**4.** If we are to interpret the statute sensibly, we must consider upward classifications of offenses from misdemeanors to felonies as well as downward classifications of offenses from felonies to

misdemeanors, see note 3. I know of no principled basis for treating the two situations differently.

**5.** Because I believe the statute is ambiguous, I think that the majority is incorrect in asserting that McGlory's proposed construction of Section 841 would require the addition of words to the statute. See Majority Opinion at 351. McGlory's position requires that the statute be read as it is written—in the present tense. The majority position, in contrast, arguably requires the addition of words to the statute. Because the majority allows imposition of sentence on the basis of convictions that either are or *were* felonies under state law, its interpretation requires the statute to be rewritten to say a prior felony conviction is an offense "that is [or *was*] ... a felony under any law of a state."

sidered the possibility of reclassification, I would therefore next determine whether we can interpret the statute based on the overall structure and purposes of the Act. See generally *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 2172–73, 104 L.Ed.2d 811 (1989) (relying on structure of statute to construe its meaning).

This statute appears, however, to have had many purposes, and it is difficult to extract a single legislative "purpose" from it. The statute's purpose may fairly be read as punishing those individuals who, even though they had prior convictions for felonies, were willing to repeat felonious conduct; under this theory, such individuals are dangerous and undeterred by law, and Congress wanted to imprison them for life as a method of incapacitating them. Viewed from this perspective, the subsequent reclassification of an offense is of little significance. Rather, the critical question is whether the individual is so inveterate in his or her criminality that he or she is willing to commit drug felonies despite having already been sanctioned twice for drug felonies by the criminal justice system. Such conduct reflects an individual's inability to conform his or her conduct to society's norms at the time, whatever the subsequent classification of that conduct. Congress may simply have wanted to remove such recidivists from society.

We cannot, however, interpret the statute's purpose as always favoring maximum incapacitation of prior drug offenders. If that were the case, the statute would not limit the mandatory life imprisonment penalty to those previously convicted of felonies. Individuals convicted of two drug misdemeanors also demonstrate recidivism but are plainly not punished with life imprisonment under the statute. An implicit goal of the act is to provide a rational sentencing policy for drug offenders.[6] Under such a policy, the penalty of life imprisonment is limited to those individuals who have repeatedly committed drug offenses

considered to be of the most serious nature—in other words, those offenses presently considered felonies. It makes little sense to sentence someone on the basis of conduct no longer considered felonious as if that conduct remained among the most serious of offenses. Therefore, if the "purpose" of the act were exclusively to provide a rational sentencing system for drug offenders, it would make little sense to enhance sentences based on conviction for a crime no longer considered a felony.

From all of this, I conclude that there is no clear policy anchor in the statute that allows us to decide this difficult question. Legislative "purposes" that might be culled from the statute are at odds with each other. Therefore, as with the text and the history of the statute, the legislative "purpose" of the act does not favor one result over the other.

When the construction of a statute becomes as difficult as it is in this case, we frequently turn to other principles to construe the statute. For example, courts, in interpreting ambiguous criminal statutes, will resolve the ambiguity in favor of lenity towards criminal defendants. See *United States v. R.L.C.,* —— U.S. ——, 112 S.Ct. 1329, 1338, 117 L.Ed.2d 559 (1992); *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 1439, n. 10, 63 L.Ed.2d 715 (1980) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.") (quoting *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 522, 30 L.Ed.2d 488). That principle is unhelpful here, however. The interpretation that McGlory urges, while more lenient towards him, is not necessarily more lenient to the entire class of affected criminal defendants, which is the relevant consideration. See *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987). In the situation obverse to that of McGlory's, a criminal defendant convicted of a misdemeanor that has subsequently been reclassified as a felony would be sub-

---

**6.** This fact is made clear by the scale of penalties established in 21 U.S.C. § 841. Individuals convicted of one prior offense who violate the relevant portions of section 841 are sentenced to

a mandatory minimum sentence of twenty years. The penalty for those with two prior convictions is escalated to life imprisonment.

ject to having that misdemeanor considered a felony under the interpretation that McGlory urges.[7] That same defendant, however, would not be subject to life imprisonment under the interpretation proffered by the majority opinion. Therefore, none of the interpretations is inherently more lenient.

Another important consideration, relied on in part by the majority, is the facility with which courts can administer each of the three possible rules. The rule adopted by the majority opinion has the advantage of easy application. If a defendant has been convicted of a drug-related felony, the sentencing court simply treats it as a felony with no further inquiry. The other two possible constructions require an examination into whether the conviction would still be a felony either in November 1988 (the time of the enactment of the Act) or, alternatively, at the time when the defendant violated section 841.

In certain cases, such as this one, determining whether the offense for which defendant was convicted would be a felony in 1988 or at the time of violation is easy. Where an offense has simply been reclassified from a felony to a misdemeanor, a court only has to note the reclassification. The change in Pennsylvania law involved in this case appears to have been nothing more than a lessening of the criminal penalty and a titular change of the offense from felony to misdemeanor. Often, however, reclassifications involve subtle changes in the nature of the crime that make it difficult to ascertain whether the conduct for which defendant was convicted would in 1988 or at the time of violation be a felony.

For example, changes in the amount of narcotics required to make possession a felony might create confusion. A defendant convicted of a misdemeanor in 1980 for possessing a certain amount of narcotics might potentially have been guilty of a felony in 1988 for possessing the same amount based on a decrease in the amount required to make a possession offense a felony. To discern whether or not he or she was guilty of a "1988 felony," the court would be required to determine the actual amount involved in the prior conviction, a process that would require a minitrial on the amount involved in the prior conviction. The events may have occurred in a far-distant state and the critical witnesses may be dead or unavailable. Although, in some cases, a court might only have to refer to the pre-sentence report, in others, where the amount of narcotics involved remains uncertain, it would be impossible for a court to determine whether the conviction would be a felony offense in 1988 or at the time of violation.[8] At all events, it is always simpler to rely on what the defendant was actually convicted of, a fact that strongly militates in favor of the rule the majority adopts for purposes of sentencing under section 841.

Thus, I join in the judgment with respect to this sentencing issue on the basis of this administrability concern alone.

---

7. A classic example of reclassification that would hurt criminal defendants under the rule McGlory urges can be found in the federal laws governing the possession of crack cocaine. 21 U.S.C. § 844(a), as amended in November 1988 (the same time that section 841 was amended to add a mandatory life sentence), treats possession of crack cocaine (a mixture or substance that contains cocaine base) as a felony. See Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 102 Stat. 4370 (November 18, 1988). Individuals convicted under the old section 844(a) for possession of crack cocaine were liable only for a fine of up to $1,000 and for imprisonment only up to one year, making the crime a misdemeanor. After the amendment, defendants now face at least five years' imprisonment, which categorizes the crime as a felony. Under McGlory's interpretation, a person convicted of misdemeanor possession under the old section 844 would have that conviction converted to a felony for purposes of enhancing the sentence upon a new violation of section 841. Obviously, the rule in that instance is harsher towards criminal defendants.

8. I note in this regard that I do not see how we can carve out a case-by-case analysis for determining what was a felony in 1988 in order to except the easy cases such as this one. Nothing in the statute indicates that Congress intended such a complex inquiry.